COURT OF APPEALS
SECOND 
DISTRICT OF TEXAS
FORT 
WORTH
 
NO. 2-03-188-CV
 

 
IN 
THE INTEREST OF R.W.
 
 
 
------------
 
FROM 
THE 323RD DISTRICT COURT OF TARRANT COUNTY
 
------------
 
OPINION
 
------------
I. Introduction
        This 
is an appeal from a judgment rendered on a jury verdict terminating the 
parent-child relationship between Appellant B.B.[1] 
and his daughter, R.W. In three points, B.B. contends that the evidence is 
legally and factually insufficient to support any of the statutory grounds for 
termination pleaded by the Texas Department of Protective and Regulatory 
Services ("TDPRS"). He also contends that the trial court erred by 
denying his no-evidence motion for summary judgment because TDPRS failed to 
produce any evidence to support termination of B.B.’s parental rights based on 
section 161.001(1)(E) of the Texas Family Code. We will affirm.
II. Factual and 
Procedural Background
        In 
July 2001, B.B. began a four-month relationship with R.W.’s mother, Rhonda W. 
Approximately six weeks into the relationship, Rhonda discovered that she was 
pregnant. However, according to both Rhonda and B.B.’s testimony at trial, 
neither party believed that B.B. was R.W.’s father because a doctor had 
miscalculated Rhonda’s conception date. Therefore, both parties presumed that 
R.W.’s father was Rhonda’s prior boyfriend, Robert W. Nevertheless, during 
the remainder of the couple’s relationship, B.B. provided food and care for 
Rhonda and demonstrated an intent to treat R.W. as his biological child. In 
November 2001, Rhonda ended her relationship with B.B. and resumed her 
relationship with Robert. According to Rhonda’s testimony at trial, although 
B.B. tried to remain supportive of her and R.W. after the break-up, she 
continually pushed B.B. out of her life by constantly reiterating that R.W. was 
not his child. Thereafter, pursuant to Rhonda’s request, B.B. ceased all 
contact with her.
        R.W. 
was born on April 28, 2002. Due to Rhonda’s past history with TDPRS, R.W. was 
removed from Rhonda’s care almost immediately after birth and was placed in 
foster care. On April 30, 2002, TPDRS filed an Original Petition for Protection 
of a Child, for Conservatorship, and for Termination in a Suit Affecting the 
Parent-Child Relationship, alleging Rhonda as R.W.’s mother and Robert as 
R.W.’s father. However, paternity tests later revealed that B.B. was the 
actual biological father of R.W. As a result, on June 26, 2002, TDPRS filed a 
first amended petition to terminate the parent-child relationship between B.B.[2] and R.W., alleging that termination was sought based on 
sections 161.001(1)(D), (E) and (N) of the Texas Family Code and the best 
interest of R.W.
        On 
January 8, 2003, B.B. filed a Statement of Paternity, acknowledging himself as 
the biological father of R.W. Thereafter, on February 6, 2003, B.B. filed a 
no-evidence motion for summary judgment, alleging that TDPRS had failed to 
produce any evidence to support termination of B.B.’s parental rights based on 
the grounds provided. Although TDPRS never specifically responded to B.B.’s 
motion, TDPRS subsequently amended its petition by removing section 
161.001(1)(F) as an alleged ground for termination of B.B.’s parental rights 
and by adding section 161.001(1)(H). After a hearing, on March 24, 2003, the 
trial court denied B.B.’s no-evidence motion for summary judgment.
        On 
April 23, 2003, trial commenced before a jury. After hearing testimony from both 
sides, the jury found that B.B.’s parental rights should be terminated because 
B.B. had violated sections 161.001(1)(E) and (H) of the Texas Family Code and 
termination was in the best interest of R.W. Accordingly, on May 1, 2003, the 
trial court entered an order terminating B.B.’s parental rights to R.W. This 
appeal followed.
III. Burden of 
Proof in Termination Proceedings
        A 
parent's rights to "the companionship, care, custody, and management" 
of his or her children are constitutional interests "far more precious than 
any property right." Santosky v. Kramer, 455 U.S. 745, 758-59, 102 
S.Ct. 1388, 1397 (1982); accord Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 
1985). The United States Supreme Court, in discussing the constitutional stature 
of parental rights, states, "[T]he interest of parents in the care, 
custody, and control of their children—is perhaps the oldest of the 
fundamental liberty interests recognized by this Court." Troxel v. 
Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 2060 (2000). In a termination 
case, the State seeks to end parental rights permanently—to divest the parent 
and child of all legal rights, privileges, duties, and powers normally existing 
between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) 
(Vernon Supp. 2004); Holick, 685 S.W.2d at 20. Nonetheless, while 
parental rights are of constitutional magnitude, they are not absolute. In re 
C.H., 89 S.W.3d 17, 26 (Tex. 2002). Just as it is imperative for courts to 
recognize the constitutional underpinnings of the parent-child relationship, it 
is also essential that emotional and physical interests of the child not be 
sacrificed merely to preserve that right. Id.
        In 
proceedings to terminate the parent-child relationship brought under section 
161.001 of the Texas Family Code, TDPRS must establish one or more of the acts 
or omissions enumerated under subsection (1) of the statute and must also prove 
that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (Vernon 
2002); Swate v. Swate, 72 S.W.3d 763, 766 (Tex. App.—Waco 2002, pet. 
denied). Both elements must be established; termination may not be based solely 
on the best interest of the child as determined by the trier of fact. Tex. 
Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987). Because of 
the elevated status of parental rights, the quantum of proof required in a 
termination proceeding is elevated from the preponderance of the evidence to 
clear and convincing evidence. Santosky, 455 U.S. at 746, 102 S.Ct. at 
1391; see also Tex. Fam. Code Ann. 
§ 161.001.
        Clear 
and convincing evidence is "the measure or degree of proof that will 
produce in the mind of the trier of fact a firm belief or conviction as to the 
truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; In re 
J.F.C., 96 S.W.3d 256, 264 (Tex. 2002); C.H., 89 S.W.3d at 25. This 
intermediate standard falls between the preponderance standard of ordinary civil 
proceedings and the reasonable doubt standard in criminal proceedings. State 
v. Addington, 588 S.W.2d 569, 570 (Tex. 1979); In re D.T., 34 S.W.3d 
625, 630 (Tex. App.—Fort Worth 2001, pet. denied) (op. on reh'g). While the 
proof must be more than merely the greater weight of the credible evidence, 
there is no requirement that the evidence be unequivocal or undisputed. Addington, 
588 S.W.2d at 570. Termination proceedings should be strictly scrutinized, and 
involuntary termination statutes are strictly construed in favor of the parent. Holick, 
685 S.W.2d at 20-21; In re A.V., 849 S.W.2d 393, 400 (Tex. App.—Fort 
Worth 1993, no writ).
IV. Sufficiency 
of the Evidence
        In 
his first two points, B.B. complains that the evidence is legally and factually 
insufficient to support the jury’s findings that he: (1) engaged in conduct or 
knowingly placed R.W. with persons who engaged in conduct that endangered her 
physical or emotional well-being and (2) voluntarily, and with knowledge of the 
pregnancy, abandoned Rhonda beginning at a time during her pregnancy with R.W. 
and continuing through the birth, failed to provide adequate support or medical 
care for Rhonda during the period of abandonment before the birth of R.W., and 
remained apart from R.W. or failed to support R.W. since the birth. See Tex. Fam. Code Ann. § 161.001(1)(E), 
(H).
        A. Standard of Review
        The 
Texas Supreme Court recently clarified the appellate standards of review to be 
applied to legal and factual sufficiency of the evidence challenges in light of 
the clear and convincing evidence burden of proof in termination proceedings. J.F.C., 
96 S.W.3d at 264-68 (discussing legal sufficiency review); C.H., 89 
S.W.3d at 25 (discussing factual sufficiency review). Because termination 
findings must be based upon clear and convincing evidence, not simply a 
preponderance of the evidence, the supreme court has held that the traditional 
legal and factual standards of review are inadequate. J.F.C., 96 S.W.3d 
at 265; C.H., 89 S.W.3d at 25. Instead, both legal and factual 
sufficiency reviews in termination cases must take into consideration whether 
the evidence is such that a trier of fact could reasonably form a firm belief or 
conviction about the truth of the matter on which the State bears the burden of 
proof. J.F.C., 96 S.W.3d at 265-66; C.H., 89 S.W.3d at 25.
        Accordingly, 
in reviewing the evidence for legal sufficiency in parental termination cases, 
we "look at all the evidence in the light most favorable to the finding to 
determine whether a reasonable trier of fact could have formed a firm belief or 
conviction that its finding was true." J.F.C., 96 S.W.3d at 266. In 
conducting our review, we must disregard all evidence that a reasonable trier of 
fact could have disbelieved; however, we must consider undisputed evidence even 
if it does not support the finding. Id. If, after conducting our review, 
we determine that no reasonable trier of fact could have formed a firm belief or 
conviction that its finding was true, then we must conclude that the evidence is 
legally sufficient. Id.
        In 
determining a factual sufficiency point, we must give due consideration to 
evidence that the trier of fact could reasonably have found to be clear and 
convincing and then determine whether, based on the entire record, a fact finder 
could reasonably form a firm conviction or belief that the parent violated one 
of the provisions of section 161.001 and that the termination of his or her 
parental rights would be in the child's best interest. Tex. Fam. Code Ann. § 161.001; C.H., 
89 S.W.3d at 25. In reviewing the factual sufficiency of the evidence, we must 
consider all the evidence in the record, both that in support of and contrary to 
the trial court's findings. C.H., 89 S.W.3d at 27-29. Additionally, we 
must consider whether disputed evidence is such that a reasonable trier of fact 
could not have reconciled that disputed evidence in favor of its finding. J.F.C., 
96 S.W.3d at 266. If the disputed evidence is of such magnitude that a trier of 
fact could not reasonably have formed a firm belief or conviction that its 
finding was true, then the evidence is factually insufficient. Id.
        B. Evidence Regarding Endangering Course of Conduct
        We 
first review the evidence supporting the jury’s finding that B.B. engaged in 
conduct or knowingly placed R.W. with persons who engaged in conduct that 
endangered R.W.’s physical or emotional well-being. See Tex. Fam. Code Ann. § 161.001(1)(E). 
B.B. contends that termination was not proper based on section 161.001(1)(E) 
because he never had custody of R.W. at any time after her birth other than one 
hour of supervised visitation per week. Moreover, he maintains that remote and 
isolated incidents that occurred prior to R.W.’s birth do not constitute 
sufficient evidence to establish an endangering course of conduct. TDPRS 
maintains, however, that B.B.’s history of substance abuse, mental health 
issues, and sexual and criminal misconduct clearly demonstrates an endangering 
course of conduct that posed both physical and emotional danger to R.W.’s 
well-being.
        Under 
section 161.001(1)(E) of the Texas Family Code, the term “endanger” means to 
expose to loss or injury, to jeopardize. Boyd, 727 S.W.2d at 533. 
Accordingly, when analyzing a jury’s findings pursuant to subsection (E), we 
must determine whether sufficient evidence exists that the endangerment of the 
child's physical well-being was the direct result of the parent's conduct, 
including acts, omissions, or failures to act. In re D.M., 58 S.W.3d 801, 
811-12 (Tex. App.—Fort Worth 2001, no pet.). Termination under section 
161.001(1)(E) must be based on more than a single act or omission; a voluntary, 
deliberate, and conscious course of conduct by the parent is required. Tex. Fam. Code Ann. § 161.001(1)(E); D.T., 
34 S.W.3d at 634; In re K.M.M., 993 S.W.2d 225, 228 (Tex. App.—Eastland 
1999, no pet.). However, it is not necessary that the parent's conduct be 
directed at the child or that the child actually suffer injury. Boyd, 727 
S.W.2d at 533. The specific danger to the child's well-being may be inferred 
from parental misconduct standing alone. Id.
        To 
determine whether termination is necessary, courts may look to parental conduct 
both before and after the child's birth. D.M., 58 S.W.3d at 812. Further, 
a father’s conduct prior to the establishment of paternity may be considered 
as evidence of an endangering course of conduct. In re M.D.S., 1 S.W.3d 
190, 198 (Tex. App.—Amarillo 1999, no pet.); see also In re Stevenson, 
27 S.W.3d 195, 202 (Tex. App.—San Antonio 2000, pet. denied) (emphasizing that 
knowledge of paternity is not required in order for parental rights to be 
terminated under section 161.001(1)(E)). Consequently, scienter is only required 
under subsection (E) when a parent places the child with others who 
engage in an endangering course of conduct. In re U.P., 105 S.W.3d 222, 
236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (op. on 
reh’g).
        As 
a general rule, conduct that subjects a child to a life of uncertainty and 
instability endangers the physical and emotional well-being of a child. In re 
S.D., 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied). Drug 
use and its effect on a parent’s life and his ability to parent may establish 
an endangering course of conduct. Dupree, 907 S.W.2d at 84. Further, a 
parent's mental state may be considered in determining whether a child is 
endangered if that mental state allows the parent to engage in conduct that 
jeopardizes the physical or emotional well-being of the child. In re J.I.T.P., 
99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.); 
In re C.D., 664 S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no writ). 
Threats or attempts to commit suicide may also contribute to a finding that the 
parent engaged in a course of conduct that is detrimental to a child's physical 
or emotional well-being. See In re A.M.C., 2 S.W.3d 707, 716 (Tex. 
App.—Waco 1999, no pet.). Evidence of sexual abuse of another child, coupled 
with a present or future danger to the child in question, is also relevant to 
determine whether a parent has engaged in an endangering course of conduct, even 
if the abuse occurred prior to the birth of the subject child. See K.M.M., 
993 S.W.2d at 227-28. Moreover, evidence of an inappropriate sexual relationship 
with a minor may also be considered in determining if the parent engaged in 
conduct that endangered the emotional or physical well-being of the child. See 
M.D.S., 1 S.W.3d at 199.
        1. Substance Abuse and Mental Health Issues
        In 
the present case, TDPRS points to B.B.’s history of substance abuse and mental 
health issues as evidence of endangering conduct. The evidence demonstrates that 
B.B. continuously struggled with alcohol and drug abuse throughout the years 
prior to R.W.’s birth and that B.B.’s substance abuse often contributed to 
mental instability, including both psychosis and suicidal ideations. At trial, 
B.B. testified that he had often consumed excessive amounts of alcohol over the 
years. B.B. also admitted to previously using and selling crack-cocaine and 
marijuana. Moreover, the record contains volumes of medical records documenting 
numerous occasions between 1999 and 2002 where B.B.’s substance abuse and/or 
mental instability was so excessive that he required medical assistance or 
intervention.
        Specifically, 
in April 1999, B.B. was admitted to Trinity Springs Pavilion (“T.S.P.”), an 
in-patient psychiatric emergency center, because he was suffering from 
hallucinations based on his daily use of alcohol. B.B. confessed that spirits 
were telling him to kill himself, that he had previously attempted suicide on at 
least two occasions, and that he also was having thoughts of killing his 
stepfather.
        Approximately 
three months later, B.B. was again admitted to T.S.P. for psychiatric treatment 
after suffering from suicidal ideations. During a psychiatric assessment, B.B. 
reported that, prior to admission, he was consuming approximately twelve beers 
and a pint of vodka per day and planning to kill himself by cutting his wrists, 
drowning himself, hanging himself, or poisoning himself. He also stated that he 
had attempted to commit suicide several times over the previous year and he 
often heard voices that encouraged him to kill himself. B.B. was diagnosed with 
a severe mood disorder caused by alcohol abuse.
        Thereafter, 
in February 2000, after being released from the Billy Gregory Recovery Center 
earlier in the day, B.B. visited the emergency room at John Peter Smith Hospital 
(“J.P.S.”) after consuming large quantities of beer and cocaine, complaining 
that he was “drunk and stoned” and that he was afraid that he might hurt 
himself. In March 2000, B.B. threatened to kill himself with a cross-bow and was 
once again taken to J.P.S. for psychiatric treatment. B.B. later admitted that 
he was depressed because his girlfriend had left him, and as result, he drank a 
case of beer, snorted cocaine, smoked heroin, took both Xanax and muscle 
relaxants, and planned to commit suicide.
        Less 
than three months later, B.B. was taken by the police to the Tarrant County 
Hospital District Psychiatric Emergency Center (“P.E.C.”) after claiming 
that he wanted to commit suicide. B.B. later reported that he had consumed 
approximately thirty 40-ounce beers and seven to eight gallons of liquor in the 
previous week. In the month of June 2001, B.B. visited the P.E.C. five times for 
depression and suicidal ideations, wherein he admitted to consuming large 
quantities of alcohol prior to each visit.
        In 
November 2001, after his break-up with Rhonda, B.B. sought treatment at J.P.S. 
on two occasions for substance-induced depression, hallucinations, and suicidal 
ideations. Less than one month later, B.B. called 9-1-1 complaining of suicidal 
ideations and was taken to the Osteopathic Medical Center of Texas, where he 
told the staff that he had previously purchased four Vicodin on the street in 
order to kill himself. Shortly thereafter, in January 2002, B.B. visited J.P.S. 
after threatening to stab himself with a knife because of a fight with his 
girlfriend.
        In 
February 2002, B.B. was taken by emergency personnel to Parkland Hospital in 
Dallas, Texas, after complaining of depression and suicidal ideations. B.B. 
subsequently told the Parkland staff that he had gone to Dallas to be near his 
sixteen-year-old “sister” who was at Buckner Children’s Home and that he 
and his “sister” could communicate telepathically. According to the staff, 
B.B. appeared obsessed with the idea of being near his “sister.”
        In 
June 2002, shortly after R.W.’s birth, B.B. again threatened to commit suicide 
and was taken by the police to J.P.S. for a psychiatric assessment. There, B.B. 
reported that he had consumed large amounts of alcohol and crack-cocaine. He 
later admitted that he became angry and depressed because his girlfriend would 
not let him see his child and that he wanted to hurt his girlfriend’s 
ex-boyfriend.
        As 
previously reflected, B.B.’s course of conduct, throughout the years prior the 
establishment of his paternity to R.W, demonstrated a pattern of substance abuse 
and mental instability. However, B.B. contends that the evidence is insufficient 
to show a course of conduct that indicates a present or future danger to 
R.W.’s well-being, because he has not abused alcohol or drugs or required 
psychiatric treatment since becoming involved in this case. In response, TDPRS 
argues that B.B.’s extensive history of substance abuse is not rendered 
insufficient to establish an endangering course of conduct, merely because B.B. 
improved his behavior a few months prior to trial.
        At 
trial, B.B. maintained that he had no recollection of most of his hospital 
visits. However, he did not deny that any of the visits occurred, nor did he 
challenge the validity of any of the medical records. He testified that he was 
not concerned about his well-documented history of prior suicide attempts and 
ideations when considered with respect to raising R.W. because he was no longer 
bothered by depression and all of the incidents reflected in the records were 
based on his past conduct.
        During 
the hearing B.B. also maintained that he had not consumed any alcohol for at 
least seven to eight months prior to the termination hearing, nor had he used 
any drugs during the prior seven to eight years. Tonyia Brown, the TDPRS 
caseworker assigned to R.W.’s case, admitted that after B.B. was determined to 
be the father of R.W., he had submitted to random drug screens and had tested 
negative for drug use. Nonetheless, the record contains some evidence indicating 
that B.B.’s substance abuse was more than a remote problem in his past. For 
example, the aforementioned medical records presented by TDPRS show that B.B. 
admitted to using drugs until at least a year before the termination hearing. In 
addition, Elvia Smith, a TDPRS witness, testified that she believed that B.B. 
was still abusing alcohol because, on the Saturday prior to the termination 
hearing, she saw B.B. at his mother’s home and he was intoxicated. Moreover, 
at trial, B.B. denied that he needed treatment to combat his history of 
substance abuse. He maintained that he had voluntarily decided to stop using 
alcohol and drugs when he found out he was R.W.’s father. However, he admitted 
that he had refused to attend counseling to help him remain alcohol and 
drug-free, even though a recent substance abuse assessment recommended that he 
receive treatment four to five times a week. He also testified that he did not 
believe he needed any treatment or medication to deal with his mental disorder.
        The 
record contains a significant amount of evidence reflecting that the substance 
abuse and mental instability in B.B.’s past constituted more than just 
“remote and isolated incidents.” Despite B.B.’s contention that he had 
stopped drinking, using drugs, and being depressed prior to his involvement with 
this case, the jury was not required to ignore a long history of dependency and 
destructive behavior merely because it allegedly abated before trial. See In 
re M.G.D., 108 S.W.3d 508, 513 (Tex. App.—Houston [14th Dist.] 
2003, pet. denied). Moreover, the evidence at trial reflected that B.B. failed 
to appreciate the need for treatment to combat his history of substance abuse 
and mental instability. Therefore, the jury could infer that B.B.’s substance 
abuse and mental health issues were likely recur and further jeopardize R.W.’s 
well-being.
        B. Allegations of Sexual Misconduct
        TDPRS 
also points to allegations of prior sexual misconduct as evidence of conduct 
that endangered R.W.’s well-being. In December 1995, Smith, a family friend, 
left her five-year-old daughter, A.H., home with B.B. and two other infants 
while she went to the grocery store. After Smith arrived back from the store, 
A.H. told her that B.B. had been “naughty” with her. According to Smith, 
A.H. accused B.B. of rubbing her bottom, showing her pornographic magazines, and 
asking her to either suck or touch his penis.[3] Smith 
testified that, after her daughter told her what had transpired, she immediately 
contacted the Hurst Police Department to report the sexual abuse. Smith 
maintained that she was certain A.H. was telling the truth about the sexual 
abuse. Nonetheless, according to Smith, no criminal charges were ever filed 
against B.B. in connection with her daughter’s allegations because the Hurst 
Police Department lost the videotape containing A.H.’s outcry statement.
        Vincent 
Pancaldo, a former sexual abuse investigator for TDPRS, conducted a videotaped 
interview with A.H. shortly after the alleged abuse occurred. During the 
interview, A.H. told Pancaldo that B.B. had rubbed her clothing in both her 
vaginal and buttocks areas, placed her hand on his penis, performed oral sex on 
her, and warned her not to tell anyone. A.H. also reported that she had 
previously been sexually abused by a relative. According to Pancaldo, after 
taking a short break during the interview, A.H. came back, said that she had 
told him a lie by accident, and began crying and telling him that she thought 
she was going to get into trouble. However, he maintained that it was normal for 
young children that are scared of disclosing sexual abuse to want to recant 
their stories. Thereafter, Pancaldo testified that based on the spontaneity of 
A.H.’s original description of the abuse, he believed her outcry to be true. 
He stated that, after a full investigation into the allegations, he determined 
that there was “reason to believe” that B.B. had sexually abused A.H.
        Both 
prior to and during the termination hearing, B.B. denied that he sexually abused 
A.H. However, Laura Greuner, a therapist and licensed clinical practitioner 
dealing with parenting and substance abuse issues, testified that she was 
concerned after discussing A.H.’s allegations with B.B. She reasoned that 
although B.B had told her he did not sexually abuse A.H., he maintained that 
A.H. had tried to come on to him by attempting to give him an open-mouth kiss. 
According to Greuner, B.B.’s response fit the profile of a sex offender 
because sex offenders often characterize children as being seductive toward them 
as a way to justify their behaviors. Gruener testified that in light of the 
“reason to believe” case involving A.H., she could not recommend giving R.W. 
to B.B. until he completed a sex offender screening and received any necessary 
treatment. At trial, B.B. admitted that he had failed to complete a sex offender 
evaluation even though it was required under his TDPRS service plan, reasoning 
that he lacked the financial resources to pay for it.
        B.B. 
claims that evidence of a dubious allegation of sexual abuse that occurred seven 
years prior to the termination suit is insufficient to establish an endangering 
course of conduct. However, “it is beyond question that sexual abuse is 
conduct that endangers a child's physical or emotional well-being.” In re 
R.G., 61 S.W.3d 661, 667 (Tex. App.—Waco 2001, no pet.), disapproved of 
on other grounds, 96 S.W.3d 256 (Tex. 2002); see also In re King, 15 
S.W.3d 272, 276 (Tex. App.—Texarkana 2000, pet. denied). Accordingly, evidence 
of sexual abuse of one child is sufficient to support a finding of endangerment 
with respect to other children. See K.M.M., 993 S.W.2d at 228; Ziegler 
v. Tarrant County Child Welfare Unit, 680 S.W.2d 674, 678-79 (Tex. 
App.—Fort Worth 1984, writ ref'd n.r.e.).
        As 
the exclusive trier of fact, the function of the jury is to judge the 
credibility of the witnesses, assign the weight to be given their testimony, and 
resolve any conflicts or inconsistencies in the testimony. Herbert v. Herbert, 
754 S.W.2d 141, 144 (Tex. 1988); McGalliard v. Kuhlmann, 722 S.W.2d 694, 
697 (Tex. 1986). Therefore, despite B.B.’s contention that the allegation of 
sexual abuse was dubious, the jury was free to believe that B.B. did in fact 
sexually abuse A.H, particularly in light of his failure to complete a sex 
offender evaluation. Moreover, based on the nature of the alleged misconduct, 
the jury could infer both a present and future danger to R.W.’s well-being.
        Further, 
as reflected in the record, some evidence exists indicating that B.B. also 
engaged in an inappropriate sexual relationship with M.R., a sixteen-year-old 
girl. At trial, B.B. testified that he met M.R. in 2001, while living at a night 
shelter. B.B. admitted that he and M.R. later started a relationship; yet, he 
claimed that she had lied to him about her age. M.R. was subsequently placed in 
foster care, but ran away to be with B.B. in March 2003. While B.B. acknowledged 
that he should not have engaged in a sexual relationship with M.R. when she was 
underage, he maintained that all relations ceased when he found out her true 
age. He admitted that M.R. was living with him at his mother’s home 
approximately one month before the termination hearing, but he claimed that they 
were no longer engaged in a relationship.
        C. Criminal History
        TDPRS 
also references B.B.’s criminal history as evidence of an endangering course 
of conduct. In 1990, B.B. was convicted of the felony offense of burglary of a 
building and was sentenced to five years of probation. However, in 1992, 
B.B.’s probation was revoked because he failed to report to his probation 
officer as required by the terms of his probation; therefore, he was sentenced 
to three years’ imprisonment.
        Thereafter, 
in 1996, B.B. was convicted of the felony offense of delivery of a controlled 
substance. For that offense, B.B. received a sentence of two years that was 
probated for five years. As part of his probation, B.B. was required to spend 
four months in a drug treatment facility and to refrain from the illegal use of 
controlled substances. However, less than a year later, after B.B. was released 
from treatment, he tested positive for cocaine. As a result, B.B.’s probation 
was revoked and he was sentenced to fifteen months’ imprisonment.
        In 
May 2002, less than a year before the termination hearing, B.B. was arrested for 
misdemeanor theft. B.B. subsequently pled guilty and was sentenced to twenty 
days’ confinement in the Tarrant County Jail. However, at trial, B.B. denied 
having any knowledge of this conviction.
        Imprisonment 
alone is insufficient to show a continuing course of conduct that endangers the 
physical or emotional well-being of a child. Boyd, 727 S.W.2d at 533. 
However, it is a fact properly considered on the issue of endangerment. Id. 
at 533-34; D.T., 34 S.W.3d at 635-36. Thus, if the evidence, including 
imprisonment, proves a course of conduct that has the effect of endangering the 
child, a finding under section 161.001(E) is supportable. Boyd, 727 
S.W.2d at 533-34. Therefore, while B.B.’s criminal history and resulting 
imprisonment, standing alone, is insufficient to support the jury’s 
endangerment finding, when considered in conjunction with the evidence 
concerning B.B.’s history of substance abuse, mental instability, and sexual 
misconduct, such evidence provides further proof of a voluntary, deliberate, and 
conscious course of conduct that endangered R.W.’s well-being.
        We 
have carefully reviewed the entire record. Looking at the evidence in the light 
most favorable to the jury's finding, giving due consideration to evidence that 
the fact finder could reasonably have found to be clear and convincing, we hold 
that a reasonable trier of fact could have formed a firm belief or conviction 
that B.B. engaged in conduct that endangered R.W.’s physical or emotional 
well-being. Accordingly, we overrule B.B.’s second point.
        Because 
we have concluded there is both legally and factually sufficient evidence to 
support the jury's findings under subsection E, we need not address B.B.'s first 
point regarding the sufficiency of the evidence under subsection H. Only one 
finding alleged under section 161.001(1) is necessary to a judgment of 
termination. D.M., 58 S.W.3d at 813; In re S.F., 32 S.W.3d 318, 
320 (Tex. App.—San Antonio 2000, no pet.); see also Tex. R. App. P. 47.1.
V. No-Evidence Motion for Summary Judgment
        In 
his third point, B.B. contends that the trial court erred by denying his 
no-evidence motion for summary judgment. Specifically, he argues that summary 
judgment was proper because TDPRS failed to produce any evidence to support 
termination of B.B.’s parental rights under section 161.001(1)(E). TDPRS 
maintains that a trial court’s denial of a motion for summary judgment is not 
reviewable after a trial has been held on the merits.
        As 
a general rule, appellate courts do not have jurisdiction to review on appeal 
the denial of summary judgment. Ackermann v. Vordenbaum, 403 S.W.2d 362, 
365 (Tex. 1966); Hines v. Comm’n for Lawyer Discipline, 28 S.W.3d 697, 
700 (Tex. App.—Corpus Christi 2003, no pet.). In fact, where a motion for 
summary judgment is denied by the trial court and the case is thereafter tried 
on its merits, the order denying the motion for summary judgment is not 
reviewable on appeal. See Ackermann, 403 S.W.2d at 365; Horton v. 
Horton, 965 S.W.2d 78, 88 (Tex. App.—Fort Worth 1998, no pet.).
        While 
a no-evidence motion for summary judgment differs in some respects with the 
traditional motion for summary judgment, the comment to Rule 166a(i) states that 
the denial of a no-evidence motion for summary judgment is no more reviewable by 
appeal or mandamus than the denial of a traditional motion for summary judgment. 
Tex. R. Civ. P. 166a cmt. 
Therefore, the denial of a no-evidence motion for summary judgment should be 
treated the same as the denial of a traditional motion for summary judgment. See 
Hines, 28 S.W.2d at 700. Accordingly, we have no jurisdiction to review the 
trial court’s denial of B.B.’s no-evidence motion for summary judgment. 
Thus, we dismiss B.B.’s third point.
VI. Conclusion
        Having 
disposed of all of B.B.’s points on appeal, we affirm the trial court’s 
judgment.

 
                                                          SUE 
WALKER
                                                          JUSTICE

 
PANEL 
A:   CAYCE, C.J.; LIVINGSTON and WALKER, JJ.
 
DELIVERED: 
February 5, 2004

 
NOTES
1. 
To protect the privacy of the parties involved in this appeal, we identify them 
by initials or first names only. See Tex. Fam. Code Ann. § 109.002(d) 
(Vernon 2002).
2. 
The petition also sought to terminate the parental rights of R.W.’s presumed 
father, Samuel W. However, on April 7, 2003, Samuel W. was removed from the suit 
after being excluded as the father of R.W.
3. 
Smith testified at trial that she was unsure as to whether A.H. had told her 
that B.B. asked her to suck or to touch his penis. However, she stated, “I 
believe it was to suck his penis.”