### In the Interest of Paris STEVENSON, et al., Children.

#### No. 04–98–00893–CV.

Court of Appeals of Texas,
San Antonio.

Aug. 16, 2000.

Rehearing En Banc Consideration Overruled
Aug. 18, 2000.

Alex Hernandez, Law Office of Alex Hernandez, San Antonio, for appellant.

Brenda Lee Knowles, Law Office of Brenda Lee Knowles, Daniel Thornberry, Asst. Crim. Dist. Atty., San Antonio, Charles G. Childress, Asst. Atty. Gen., Austin, for appellee.

Sitting: PHIL HARDBERGER, Chief Justice, ALMA L. LÓPEZ, Justice, KAREN ANGELINI, Justice,

## OPINION

Opinion by: PHIL HARDBERGER, Chief Justice.

On its own motion, the panel withdraws its original opinion and judgment dated March 8, 2000. This opinion and judgment are substituted. The opinion is revised to clarify that if parental termination is sought under section 161.001(1)(D)of the Texas Family Code, the trial court must instruct the jury that it must find by clear and convincing evidence that the parent knew the child was his when he engaged in the conduct proscribed by section 161.001(1)(D). However, if parental termination is sought under section 161.001(1)(E), the trial court is not required to give such an instruction, because such knowledge is not required. In this case, the jury charge permitted the jury to terminate parental rights if it determined that the parent, Rene Grant, engaged in conduct proscribed by section 161.001(1)(D) or 161.001(1)(E). The jury could have determined that Grant engaged in conduct proscribed by section 161.001(1)(D), but did not engage in conduct proscribed by section 161.001(1)(E). Therefore, Grant was entitled to the instruction as it related to section 161.001(1)(D).

Grant appeals an order terminating his parental rights to Kenya Stevenson ("Kenya"). Grant presents two issues in his brief, arguing that: (1) the trial court erred in denying his requested jury instruction; and (2) the evidence is insufficient to support the jury's answers to the questions about Grant knowingly committing any acts or omissions which endangered Kenya.[1] We sustain Grant's first

---

1. Since Grant's brief challenges the credibility of the testimony establishing his knowledge at an earlier date, and since Grant's prayer concludes that the "jury's finding is against the great weight," we construe Grant's second issue as challenging the factual sufficiency of the evidence. Because we conclude that the judgment must be reversed and the cause remanded based on Grant's first issue, we do not address Grant's second issue. We note, however, that the testimony of Cheryl, Cheryl's mother and Diana Gonzalez would provide sufficient evidence to overrule a legal sufficiency challenge.

issue and reverse the trial court's order, but only to the extent that it terminates the parent-child relationship between Grant and Kenya.

## Factual and Procedural History

The well-being of Kenya, his older sister (Paris), and younger brother (Malcolm) was first investigated by Child Protective Services ("CPS") in 1996, when questions were raised regarding their mother's mental stability and her failure to seek medical treatment for one of the children. A CPS worker visited the home in August of 1996 and offered counseling, which was refused. The case was closed when the CPS worker determined that the grandmother was also residing in the home with the children, the house was clean, and the children were regularly attending school.

In April of 1997, another referral was made regarding the welfare of Kenya, Paris and Malcolm. The referral stated that: (1) their mother was walking around the housing project incoherent, claiming men had taken her body parts, (2) the children were allowed to remain outside at all hours unsupervised and were being disruptive to property, and (3) the grandmother was not supervising the children. When a CPS worker first attempted to visit Kenya's mother, Cheryl Stevenson ("Cheryl"), regarding the referral, Cheryl denied the CPS worker entrance to the home, stating that they had been exposed to hepatitis. The CPS worker told Cheryl to get the children checked. The CPS worker subsequently determined that the children had been taken to the doctor, but Cheryl did not notify CPS.

When the CPS worker made her second visit, Malcolm had a bump on his head. No medical attention had been sought because Cheryl blamed Malcolm for falling down the stairs after she told him to stay upstairs. During that visit, the children stated that they were being left alone and that their mother would fight with invisible people. The children also stated that their mother believed cameras had been planted in their apartment. Cheryl informed the CPS worker that Paris had been born addicted to cocaine, but Cheryl claimed that she had not used drugs or alcohol since Paris's birth. Cheryl also confirmed that her internal reproductive organs had been removed by two men, who were managers with the San Antonio Housing Authority. The CPS worker testified that the children were not attending school on a regular basis. The assistance offered by the CPS worker was refused. At that time, the children's grandmother was in the San Antonio State Hospital, diagnosed as schizophrenic.

On July 16, 1997, CPS workers returned to the home with a verbal order from Judge Sakai to remove the children from the home. Cheryl refused to surrender the children, wielding a knife and hammer and yelling profanities. The police ultimately convinced Cheryl to give the children to her sister. Cheryl released the children, but fought with police when the children were placed in a CPS vehicle. Cheryl was arrested as a result.

Cheryl identified Christopher Harris as the father of Paris and Malcolm. Cheryl also identified Grant as Kenya's father. Cheryl informed the CPS worker that Grant was in the Texas Department of Corrections ("TDC") for 15 years for crack cocaine. The CPS worker testified that she never attempted to locate an alleged father in jail based on a name, because she had been told that more information was needed, i.e., a social security number or SID number.

After the children were taken into custody, Diana Gonzalez was assigned the case. She developed service plans for Cheryl, Harris and Grant. Gonzalez testified that she is required to develop a service plan for each of the identified parents even if she does not know the whereabouts of a parent. The service plans are revised and approved by the court every six months. One of the items identified in Cheryl's plan was the need for a psychiatric and psycho-

logical evaluation, but Cheryl failed to show up for the scheduled appointments.

In January of 1998, Diana Gonzalez discovered that Kenya's father was out of prison and living in San Antonio. Gonzalez first contacted Grant's parole officer on March 30, 1998, and the parole officer stated that Grant would be given the information. On April 7, 1998, Gonzalez contacted the parole officer again, and the parole officer stated that she had given Grant the information. The parole officer also told Gonzalez that Grant stated that he was Kenya's father. The parole officer gave Gonzalez an inaccurate phone number for Grant, and Gonzalez did not get a correct phone number until June of 1998. On June 8, 1998, Grant met with Gonzalez. Grant told Gonzalez that he had been out of prison for eight months and was staying at Victory Gospel. Grant was diagnosed as a schizophrenic, was seeing a psychiatrist and taking medication. Grant stated that he was going to pray about what he should do. Grant testified that he knew Cheryl's children were in foster care, but did not know the situation was serious. Gonzalez testified that Grant's statement that he did not know Kenya was his son conflicted with his earlier statement regarding his knowledge that Kenya was in foster care.

A week later, Grant was offered the most current plan of service. During a July 23, 1998 staffing regarding the children, Grant was present and stated that he did not know about Kenya until he was contacted by CPS. Cheryl's mother contradicted Grant's statement and asserted that he did have knowledge of his paternity.

On August 5, 1998, Cheryl delivered a fourth baby, who was addicted to cocaine. Cheryl identified Grant as the father. On August 13, 1998, Cheryl and Grant were ordered to get tested for drug use. Grant tested negative. Gonzalez testified that while awaiting the testing, she overheard Grant apologizing to Cheryl for starting her on crack. Gonzalez stated that she

believed Grant was aware that he fathered Kenya, and was aware of Cheryl's lifestyle. By leaving Kenya in Cheryl's care, Gonzalez testified that Grant knowingly endangered Kenya.

Gonzalez admitted that Grant had complied with certain aspects of his service plan and that he had only had the plan for a short time. Gonzalez admitted that a psychologist, who had evaluated Grant, recommended visitation with Kenya, contingent upon Grant meeting the service plan's requirements.

Cheryl testified that Grant caused her cocaine addiction. Cheryl stated that Grant lived with her for a period of time before he went to prison. Cheryl further stated that she told Grant that he was Kenya's father while she was pregnant. Cheryl stated that Grant knew that Kenya was placed with CPS when he visited her upon being released from prison. After Kenya was born, Cheryl testified that Grant saw Kenya but did not support him.

Grant's testimony regarding his knowledge of Kenya was equivocal and was contradicted by the testimony of Cheryl and Gonzalez, including Gonzalez's testimony regarding the statements made by Cheryl's mother and Grant's parole officer as to the extent of his knowledge and his willingness to acknowledge paternity. Grant denied that Cheryl had informed him that Kenya was his son when she was pregnant. Grant admitted that he had heard before he went to prison, and while in prison, that he was Kenya's father. Grant stated he heard this from friends and Cheryl's mom; however, Grant asserted that Cheryl's mom also told him that he was Paris's father. Grant stated that when he heard these things, he did not know for a fact that he was Kenya's father. Grant testified that his parole officer asked him if he knew anything about Cheryl's children, and Grant admitted he did. Grant did not testify that he told the parole officer that he was Kenya's father. Grant stated that he called the phone num-

ber for the CPS worker that his parole officer gave him. Grant admitted that there was a delay in returning the call to CPS because he was involved in a ministry in Waco.

Grant stated that when he returned Gonzalez's call, she talked to him about Kenya. Grant told her he had a picture of Kenya, because Cheryl's mother had given him one in December or January. Grant stated that the picture looked like him when he was a little boy, and that was all he was going on because he had only seen Kenya once as a baby. Grant stated he stopped by once to see Kenya when he was a baby and asked Cheryl who the father was. Cheryl did not tell him. Grant stated Kenya could have been his. In response to continued questioning as to whether he thought he had two children by Cheryl, Grant responded, "I didn't know. I didn't know." Grant admitted that when he was released from prison, he went back to using drugs with Cheryl. At that time, Cheryl's sister told him the state had taken the children. Grant testified that the only thing that planted in his mind that Kenya might be his is when Cheryl's mom gave him the picture. Grant also admitted that he had fathered two other children for whom he had not done very much On redirect examination, Grant stated that when he was released from prison, he did not know for a fact that Kenya was his son.

### Jury Charge

In his first issue, Grant contends that the trial court erred in denying his requested instruction, informing the jury that Grant's parental duty to protect Kenya should be judged from the moment he knew that he was the biological father of Kenya. The record regarding this issue reflects the following:

> THE COURT: Mr. Hernandez, we've taken up the charge. Do you have any objections or requests to the charge?
> MR. HERNANDEZ: Yes, Your Honor. For the record, I have submitted to the court earlier a proposed charge which would add some language to the charge that the court provided us yesterday. If the court may allow me, I would be glad to read it into the record. The way I would propose a charge is language that would say that before the parent-child relationship between Rene Grant and Kenya Stevenson [is] terminated, it must be proven by clear and convincing evidence that the parent has knowingly placed or knowingly allowed Kenya Stevenson to remain in conditions or surroundings which endangered his physical or emotional well-being and/or engaged in conduct or knowingly placed Kenya Stevenson with persons who engaged in conduct which endangers his physical or emotional well-being.
>
> In order for Rene Grant to have engaged in the conduct mentioned in one and two above, you must also find by clear and convincing evidence that Rene Grant knew that Kenya Stevenson was his child when he engaged in such conduct. If the evidence does not show in a clear and convincing manner that Rene Grant knew Kenya Stevenson was his child, then you must not terminate his rights as a parent.
>
> As I noted to the court yesterday, the purpose which I would like this language added is because there is, at least based on the evidence that has been presented in this trial, a fact issue as to whether Mr. Rene Grant knew that Kenya Stevenson was his child, and there's a fact question as to when he knew. Of course, this is all very relevant to when he engaged in the conduct which is supposed to be the conduct that should allow the jury to terminate his rights as a parent, and that's the reason why I'm asking for these changes and these additions.
>
> THE COURT: All right. Now, I mentioned to you all yesterday that I was gonna ask you how much time you wanted to have for argument. How much time?

At the beginning of the charge conference, the trial court noted that there was an informal conversation the day before on the subject of the charge that was not recorded because the trial judge excused the court reporter. The State asserts that because the informal proceeding was not recorded and, since the trial court's only response to Grant's requested instruction was, "All right," Grant failed to preserve error because he did not obtain an adverse ruling.

■ Rule 278 of the Texas Rules of Civil Procedure states that "[f]ailure to submit [an instruction] shall not be deemed a ground for reversal of the judgment unless a substantially correct [instruction] has been requested in writing and tendered by the party complaining of the judgment." Tex.R. Civ. P. 278. However, rule 278 must be read in connection with Texas Supreme Court precedent addressing preservation of error in jury charges. *Green Tree Financial Corp. v. Garcia*, 988 S.W.2d 776, 780–81 (Tex. App.—San Antonio 1999, no pet).

In *State Dept. of Highways v. Payne*, 838 S.W.2d 235, 241 (Tex.1992), the Court stated: "There should be but one test for determining if a party has preserved error in the jury charge, and that is whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling." Since *Payne*, the Court has repeatedly emphasized its holding in connection with the timing of objections and the wording of requests, asserting that we should concern ourselves with common sense and not promote form over substance. See *Dallas Market Center Development Co. v. Liedeker*, 958 S.W.2d 382, 386 (Tex.1997); *Alaniz v. Jones & Neuse, Inc.*, 907 S.W.2d 450, 451–52 (Tex.1995); *Texas Dept. of Human Services v. Hinds*, 904 S.W.2d 629, 637–38 (Tex.1995).

■ In this case, we have a trial court receiving formal objections and requests to a final jury charge prepared after an informal conference. The attorney states that the request was "submitted" to the trial

court earlier in a "proposed charge," and during the formal charge conference, the attorney "reads" the language into the record. The attorney clarifies the basis for the request as he had noted "yesterday." Based on this record, we believe Grant made the trial court aware of his complaint, timely and plainly, and obtained a ruling. See *State Dept. of Highways v. Payne*, 838 S.W.2d at 241.

Having determined that Grant preserved his jury charge issue, we must consider whether his requested instruction was substantially correct. The State contends Grant's request is an incorrect reading of sections 161.001(1)(D) and (E) of the Texas Family Code. The State asserts that the statutory provisions do not require that Grant know that Kenya is his son before their requirements apply. With regard to section 161.001(1)(D), the State's argument is contrary to a prior decision of this court.

In *Djeto v. Texas Dept. of Protective and Regulatory Services*, 928 S.W.2d 96, 97 (Tex.App.—San Antonio 1996, no writ), Luc Djeto appealed the termination of the parent-child relationship between him and his son, Luke Byars, who was born in March of 1989. At some point in 1992, Djeto suspected that he was Luke's father and agreed to a blood test. See *id.* In early 1993, at the expense of the Texas Department of Protective and Regulatory Services, the blood test was conducted, conclusively establishing Djeto's paternity as to Luke. See *id.*

After noting the standard to be applied in reviewing a challenge to the legal and factual sufficiency of the evidence supporting a termination decree, this court noted that as a precursor to an evidentiary examination of whether a parent has committed one or more of the acts contained in section 161.001, "we must ascertain whether [the father] had a duty to act or refrain from acting in a particular manner. In order for an enforceable obligation to exist requiring the support of an illegitimate

child, there must be a court order, a judicial admission, or an unequivocal acknowledgment of paternity." *Id.* at 98 (citing *Jimenez ex rel. Little v. Garza,* 787 S.W.2d 601, 603 (Tex.App.—El Paso 1990, no writ)). After examining the record, this court noted "varying degrees of equivocation and denial by Djeto about his paternity of Luke; there is no straightforward acknowledgment or judicial admission that Luke is his child." *Id.* This court similarly asserted that responsibility for Luke's physical or mental well-being could not be ascribed to Djeto prior to rendition of the order of paternity. *Id.* We concluded that Djeto's acts or omissions regarding Luke prior to that time could not be considered. *Id.* Since Luke had been in the care and custody of the Department continuously since well before Djeto's paternity was adjudicated, and all visits since that time had been supervised, we vacated the termination order based on insufficient evidence. *Id.*

 Although we believe this court correctly decided the issue presented in *Djeto* under the facts presented in that case, we also agree with the distinction made by our sister court in *In re M.D.S.,* 1 S.W.3d 190, 198 (Tex.App.—Amarillo 1999, no pet.). In *Djeto,* the two bases alleged for termination were that Djeto had (1) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child, and (2) failed to support the child in accordance with his ability during a period of one year ending within six months of the date of the petition for termination was filed. *Djeto,* 928 S.W.2d at 98. These bases are found in sections 161.001(1)(D) and 161.001(1)(F) of the Texas Family Code. *See* Tex. Fam. Code Ann. §§ 161.001(1)(D), 161.001(1)(F) (Vernon Supp.2000). In *In re M.D.S.,* the Amarillo court distinguished *Djeto* when termination of parental rights is sought based on section 161.001(1)(E), which requires the trial court to find that the parent "engaged in conduct ... which endan-

gers the physical or emotional well-being of the child." 1 S.W.3d at 198. Because section 161.001(1)(E) requires only that the parent's conduct endanger the child, the Amarillo court concluded that a father's conduct prior to the establishment of his paternity can be considered under section 161.001(1)(E). *See id.* We agree with this distinction; however, since termination in this case could have been based on section 161.001(1)(D), Grant was required to have knowledge that Kenya was his child in order for his rights to be terminated on that basis. We emphasize, however, that such knowledge is not required in order for parental rights to be terminated under section 161.001(1)(E).

The jury charge that was submitted reads, in pertinent part:

In the case, before the parent-child relationship between Rene Grant and the child Kenya Stevenson can be terminated the jury must be persuaded by clear and convincing evidence that he has:

(1) Knowingly placed or knowingly allowed the child or children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children;

and/or

(2) Engaged in conduct or knowingly placed the child or children with persons who engaged in conduct which endangers the physical or emotional well-being of the children;

Subparagraph (1) contains the charge relating to termination under section 161.001(1)(D). Subparagraph (2) contains the charge relating to termination under section 161.001(1)(E). Because the subparagraphs permit termination if the jury finds (1) and/or (2), the jury's finding that Grant's parental rights should be terminated may have been based solely on the jury's belief that Grant committed acts that would permit termination under section 161.001(1)(D). In other words, the

jury may have found termination proper under subparagraph (1) but not subparagraph (2). In order for termination to have been proper under subparagraph (1), the jury could only consider Grant's actions after he knew that Kenya was his child. Because of the and/or nature of the jury charge submission, the trial court's denial of Grant's requested instruction would be erroneous if the facts entitled Grant to an instruction as it related to section 161.001(1)(D).

The facts were conflicting as to when Grant had knowledge that Kenya was his child. Without an instruction requiring the jury to limit their consideration of Grant's acts or omissions to a time after Grant acquired that knowledge by resolving his doubts, the jury could have considered acts or omissions occurring before that date, which would have been improper in determining that termination was appropriate under section 161.001(1)(D). If the jury believed that Grant had doubts about paternity until he was presented with Kenya's picture or until he was contacted by CPS, Kenya was already in CPS's custody when Grant acquired knowledge of his paternity. After coming into contact with CPS, Grant complied with his service plan. Because we do not know when the jury would have found that Grant acquired knowledge that he was the father of Kenya, we do not know if the jury considered acts or omissions that occurred before that knowledge was obtained. Given the environment in which Kenya lived before he was placed in CPS custody, we cannot conclude that the failure to instruct the jury was harmless if the jury improperly considered Grant's prior acts and omissions in failing to remove Kenya from that environment.

Grant's first issue is sustained.

## Conclusion

The trial court erred in denying a properly requested jury instruction. The order of the trial court is reversed, but only to the extent that it terminates the parent-child relationship between Rene Grant and Kenya Stevenson, and the cause as it relates to the parental rights of Rene Grant is remanded to the trial court for further proceedings consistent with this opinion. All other orders and judgments of the court in the underlying cause remain in full force and effect.

Dissenting opinion by: TOM RICKHOFF, Justice (on motion for rehearing en banc).

TOM RICKHOFF, Justice, dissenting, on motion for rehearing en banc.

A mother walked out of a hospital after giving birth and said, "it's not my child," in a termination suit I presided over years ago. With *Djeto* and this opinion, we allow a father to avoid responsibility by merely saying he was not sure the child was his when termination is sought under section 161.001(1)(D) of the Texas Family Code. *See* Tex. Fam.Code Ann. § 161.001(1)(D) (Vernon Supp.2000). Unlike the abandonment provision in section 161.001(1)(H), which specifically requires "knowledge of the pregnancy," the legislature did not require a parent to "know" that he is the father when he engaged in the prohibited conduct. *See id.* § 161.001(1)(H). Naturally, it is absurd for a mother to disclaim the child she bore. Her obligations under section 161.001(1)(D) and (E) begin the moment of birth (some would say earlier). *See id.* § 161.001(1)(D), (E). A father's obligation also begins at that moment of birth whether his choice is to remain invincibly ignorant, incarcerated, or addicted. The legislature does not require him to embrace paternity and its responsibilities.

I would overrule *Djeto* and hold that the jury here properly considered the evidence that Grant endangered Kenya by acts or omissions that occurred at any time. I would further find that the judgment is supported by legally and factually sufficient evidence.