## In the INTEREST OF S.

### No. 00–1021.

Supreme Court of Texas.

June 7, 2001.

Justice OWEN, joined by Justice HECHT, dissenting from the denial of the petition for review.

The issue in this case is whether, in a proceeding to terminate a parent-child relationship, a court must find by clear and convincing evidence that a father knew the child was his when he "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child."[1] The court of appeals reversed the trial court's judgment terminating Rene Grant's parental relationship with his son K.S. because the jury was not instructed that it could only consider Grant's acts or omissions after the point in time that Grant "resolv[ed] his doubts" that he was K.S.'s father.[2] The court of appeals concluded that a father must know that the child is his before termination can be based on subsection (D) of section 161.001(1) of the Family Code, but that knowledge of paternity is not required for termination under subsection (E).[3]

The Texas Department of Protective and Regulatory Services tells us in its

1. TEX. FAM.CODE § 161.001(1)(D).

2. *In re Stevenson*, 27 S.W.3d 195, 203 (Tex. App.—San Antonio 2000).

3. TEX. FAM.CODE § 161.001(1)(D), (E).

briefing that there have been thirty-six termination appeals in the year 2000 involving subsections (D) and (E) of section 161.001(1). How these provisions of the Family Code should be construed is an important issue that the Supreme Court of Texas should resolve. I accordingly dissent from the denial of the petition for review in this case.

Grant met K.S.'s mother Cheryl Stevenson in 1980 and used drugs with her for a number of years thereafter. Stevenson became addicted to cocaine. There is evidence that Grant introduced Stevenson to cocaine and that many years later, he apologized to her for his role in her drug addiction. K.S. was born in 1989. Grant admitted that he had unprotected sex with Stevenson during the time that K.S. was conceived but ignored statements that K.S. was his child because Stevenson had also told him that he was the father of her older child, which was not true. Grant lived with Stevenson after K.S.'s birth. He testified that he did not really remember children being in the home because he was, in his words, "catatonic" from 1988 to 1990. He remembers only parties and drugs during the time he lived with Stevenson after K.S.'s birth. Grant and Stevenson separated at some point, but continued to see one another until Grant was imprisoned after being convicted of violations of drug laws.

When K.S. was about seven, and while Grant was in prison, the Texas Department of Protective Services first became involved with Stevenson and her three children. About a year later, the Department removed Stevenson's children, including K.S., from their home after receiving reports that Stevenson was incoherent and walking around the housing project in which they lived claiming that men had removed some of her body parts. The Department had also received a complaint that the children were allowed to remain outside at all hours unsupervised and were causing property damage. The children had admitted in an earlier interview with the Department that they were often left alone and that when their mother was home, she fought with what she said were invisible people. On a visit to the children's home, Stevenson had also told a Department worker that two men who were with the San Antonio Housing Authority had removed her reproductive organs. When the Department first attempted to remove the children, Stevenson brandished a knife and hammer and yelled profanities. The police were called, the children were removed, and Stevenson was arrested for assault.

About two months later, Grant was released from prison and began using drugs again with Stevenson. He knew that the Department had taken Stevenson's children into custody. He testified that it did not occur to him that his complicity in Stevenson's continued drug use might play a part in the termination of her parental rights.

A few months later, in December 1997, Grant says that he became a Christian, quit using drugs, and joined a ministry. In the spring and summer of the following year, 1998, Grant was contacted by the Department about K.S.. The evidence is conflicting about whether he acknowledged at that time that he was K.S.'s father. Grant said that it was not until some point during that summer that he came to believe that he was the child's father. He did not believe so earlier, he said, even though Stevenson's mother and friends had told him that he was K.S.'s father and a picture of K.S. that Stevenson's mother gave to him made him think that K.S. might be his son.

The Department brought parental termination proceedings against both Grant and Stevenson. At some point before tri-

al, Grant asserted that he did not want his parental rights terminated. A jury found against both Stevenson and Grant. As to Grant, the jury was instructed:

> In the case, before the parent-child relationship between Rene Grant and the child [K.S.] can be terminated the jury must be persuaded by clear and convincing evidence that he has:
>
> (1) Knowingly placed or knowingly allowed the child or children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children;
>
> and/or
>
> (2) Engaged in conduct or knowingly placed the child or children with persons who engaged in conduct which endangers the physical or emotional well-being of the children;

The trial court terminated Stevenson's and Grant's parental rights. Stevenson did not appeal, but Grant did. As noted above, the court of appeals reversed the trial court's judgment and remanded the case for another trial. The court of appeals held that termination of Grant's parental rights could not be based on the jury's findings in response to the foregoing instruction because in connection with paragraph (1), the jury may have considered acts or omissions by Grant before he "resolv[ed] his doubts" and knew that he was K.S.'s father.[4]

The court of appeals relied on one of its earlier decisions, *Djeto v. Texas Department of Protective and Regulatory Services.*[5] No petition for review was filed with the Supreme Court of Texas in *Djeto.* After quoting extensively from *Djeto,* the court of appeals reasoned that a father must know that the child is his before his rights can be terminated under subsection (D) for placing the child or allowing the child to remain in conditions that endanger the child. However, the court of appeals also concluded that knowledge of paternity is not necessary if, under subsection (E), a father's own conduct endangers the child or if the father knowingly placed the child with someone else whose conduct endangered the child.[6]

Given the significance of the court of appeals' decision for K.S. and other children in circumstances similar to his, and because the court of appeals' interpretation of section 161.001(1)(D) is debatable, I would grant the Department's petition for review and decide this case on its merits. Because the Court refuses to do so, I respectfully dissent.

[redacted]

4. *Stevenson,* 27 S.W.3d at 203.

5. 928 S.W.2d 96, 97 (Tex.App.—San Antonio 1996, no writ).

6. *Stevenson,* 27 S.W.3d at 202.