

## Fourth Court of Appeals
### San Antonio, Texas

## MEMORANDUM OPINION

No. 04-19-00369-CV

**IN THE INTEREST OF N.N.M.**

From the 365th Judicial District Court, Dimmit County, Texas
Trial Court No. 17-01-13061-DCVAJA
Honorable Amado J. Abascal, III, Judge Presiding

Opinion by:  Liza A. Rodriguez, Justice

Sitting:  Rebeca C. Martinez, Justice
Patricia O. Alvarez, Justice
Liza A. Rodriguez, Justice

Delivered and Filed: August 19, 2020

AFFIRMED AS MODIFIED

Appellant Don S.[1] appeals the trial court's order terminating his parental rights to his daughter, N.N.M. On appeal, he brings three issues: (1) the evidence is legally and factually insufficient to support the jury's predicate findings pursuant to section 161.001(b)(1) of the Family Code; (2) the evidence is legally and factually insufficient to support the jury's finding that termination of his parental rights was in N.N.M.'s best interest; and (3) the jury abused its discretion in making its conservatorship finding. Because we hold there is no evidence to support the jury's finding pursuant to section 161.001(b)(1)(D), we modify the trial court's order of

---

[1] To protect the identity of the minor children, we refer to the parties by fictitious names, initials, or aliases. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

termination to delete that finding. As modified, we affirm the trial court's order terminating appellant's parental rights.

## BACKGROUND

At trial, thirty-four-year-old Don S. testified that he met thirty-two-year-old Ashley M., N.N.M.'s mother, while they were both employed at a fast-food restaurant in Lubbock, Texas. According to Don S., he and Ashley M. had been in a "sexual relationship" for "less than a month" when she told him she was pregnant. Don S. admitted that even though he knew there was a possibility that he was the father, he did not take any action to determine parentage of the baby or to provide Ashley M. with any support during her pregnancy. When Ashley M. left Lubbock shortly thereafter, Don S. did not attempt to keep in touch with her.

N.N.M. was born on August 11, 2016. At trial, Don S. was asked about a Facebook message Ashley M. sent him on March 23, 2017. He conceded that Ashley M. had probably sent him a message but claimed he "wasn't on Facebook in 2017." He testified it was not until the end of 2017 that he "got back on Facebook." He also denied receiving letters, phone calls, and emails from caseworkers with the Texas Department of Family and Protective Services.

On January 2, 2017, a couple of months before Ashley M.'s Facebook message, four-month-old N.N.M. was removed from Ashley M.'s care after being hospitalized with a brain injury. N.N.M. had been living at an RV park in Asherton, Texas, with her mother and her mother's boyfriend. In addition to a brain hematoma, N.N.M. had two healing leg fractures and visible bruising to her right shoulder. Ashley M.'s boyfriend admitted to grabbing N.N.M. by the leg and swinging her across the room, causing her head to hit the wall. In addition to her physical injuries, N.N.M. was underweight and was diagnosed with a condition known as failure to thrive. She was placed at the Davidson Respite Center and was closely monitored for weight gain. After approximately six months in the respite center, and after the Department tried but was unable to

locate any suitable family members, N.N.M. and her two-year-old sister were placed with a foster family.

When asked by the Department about N.N.M.'s father, Ashley M. eventually provided Don S.'s full name but could not provide a date of birth or address. After multiple attempts, the Department was finally able to make contact on November 7, 2017. Don S. immediately requested a DNA test. He was assigned a courtesy caseworker in his hometown of Lubbock and given a service plan. Don S. admitted at trial that he was informed he could start his services immediately, but decided to wait until the DNA results were available. According to Don S., his "concern was more about—to see if the child was mine or not, and then I'd go from there." On March 6, 2018, DNA test results showed that Don S. was N.N.M.'s father.

Including N.N.M., Don S. has six children. He admitted at trial that he does not maintain close contact with any of them except his eldest child, a daughter named Don, who is sixteen years old. Don S. testified that his ten-year-old daughter, Danylle, and his seven-year-old son, Dante, live in Bula, Texas. Don S. had not seen them in a couple of years. His nine-year-old son, Donovan, and his eight-year-old daughter, Melissa, live in Earth, Texas. Don S. last saw them in October 2017, which was eight months before trial. When asked about his pattern of not having contact with his children, Don S. blamed the mothers of his children.[2] Don S. also admitted to not having financially supported his children, estimating he owed between $40,000 and $55,000 in back child support. According to Don S., his child support obligations total $700 per month for his other five children and $137 every two weeks for N.N.M.

---

[2] Don S.'s six children have four different mothers. The mother of his eldest child, Don, is Renada D. The mother of Danylle and Dante is Brenda C. The mother of Donovan and Melissa is Betty G. Finally, N.N.M.'s mother is Ashley M.

Don S. also admitted to having an unstable work history. According to Don S., his relatives own a "little lawn services business" and paid him "under the table" for his services. He testified he had not looked for "legit permanent jobs" in the past because he did not have a valid identification card and had outstanding warrants related to traffic tickets. He testified he had gone to municipal court in an effort to resolve his outstanding warrants and was trying to enroll in "work release to work off [his] traffic tickets." Don S. testified that three months before trial, in March 2018, he started working at Goodwill, earning $9 per hour, and at Lubbock Avalanche Journal, also earning $9 per hour. Michelle Hillman, a master investigator with the Department, testified that in 2014, she investigated a referral related to Don S., his estranged wife Erika S., and his two stepdaughters. As part of that investigation, she spoke with Erika S. who said that she and Don S. argued a lot because he did not want to work. Erika S. told Hillman that Don S. did not want to work because he did not want to pay child support for his children.

The instant case is not the first time one of Don S.'s children has been involved in an investigation with the Department. In 2011, when his daughter Danylle was two years old and his son Dante was four months old, they were found living in a car with their mother, Brenda C. Caseworker Eva Stamps testified at trial that their mother had not been able to feed or clothe the children. According to Stamps, the Department had one contact with Don S. on August 20, 2011 when he called from a blocked number and asked what he needed to do to care for the children. After that conversation, the Department was never able to make contact again, and Don S. never called the Department again. When asked about the 2011 investigation, Don S. admitted that he had heard that Brenda C. had been looking for him around that time and found out about the case from his brother. However, by the time he was able to make contact with Brenda C., she was back home living with her parents. He admitted that he did nothing at that time to help Brenda C. or his children.

In addition to his failure to visit or support his children, Don S. has a history of domestic violence. Hillman testified that the 2014 investigation by the Department was related to allegations of drug use and domestic violence between Don S. and Erika S. When Hillman went to interview Don S. and Erika S. at the duplex where they had been living, the neighbor informed her the family had moved. According to the neighbor, the two children, Don S.'s stepdaughters, had been allowed to "run around unsupervised all the time." The neighbor said that Don S. and Erika S. "were using marijuana" and that the neighbor "often heard yelling and screaming coming from inside" the family's duplex. Hillman was able to determine that the family had stayed at the Salvation Army from August 5, 2012 to June 12, 2013. She then found Don S. and the children at a hotel in Lubbock. Don S. admitted to Hillman that he regularly smoked marijuana but said that he did not smoke it in front of his stepdaughters. He also denied any domestic violence.

Hillman then talked to Don S.'s stepdaughters: twelve-year-old Zoey and nine-year-old Olivia. Olivia confirmed that Don S. smoked marijuana every day and that she and her sister had to leave the hotel room or house, wherever they were living, so they would not be around the smoke. Olivia also said that Don S. drank alcohol while her mom was working and that when her mother would come home from work, they would start arguing. Olivia never saw any physical fighting, but her sister, Zoey, said that she had seen Don S. push her grandmother, Maria S., and had been very scared that Don S. was going to injure her grandmother. At a later date, Hillman was able to interview Erika S., who confirmed that there had been "some physical altercations" between Don S. and her. However, she said the children had not been present. Erika S. said that Don S. had struck her in the past when the children had not been present and she had been "knocked out by him." Erika S. told Hillman that she was trying to leave Don S. and find a place where he would not be able to find her. According to Hillman, Don S.'s stepdaughters were placed with their grandmother and the case was closed "because the children stated that they did not ever see

any kind of physical violence between [Don S. and Erika S.] and they were of age that they knew whenever any kind of marijuana was being used," they should leave the area.

At trial, Don S. was questioned about the incident involving him and Maria S., his mother-in-law. He admitted that he had been arrested for assaulting Maria S. on January 30, 2014. Don S. testified,

> Well, [Maria S.] came to my apartment and she walked in my home and started demanding things, and, yes, we both did raise our voice[s], and that was basically it. And she called the police and I guess the neighbors—because the police went to talk to the neighbors because they were standing outside. And they said that I shoved her, and I've never touched her. And so since they say that I shoved her, I got arrested for it.

Don S. also admitted that he been arrested on January 4, 2005, for assaulting his girlfriend, Nadine B. However, he denied the allegations that he grabbed Nadine B. by the arms and pushed her against the wall, "holding his forearm against her neck causing red marks and scratches on her shoulder." Don S. claimed Nadine B. had been lying about the assault. When asked if it was true that he and Nadine B. were still screaming at each other when the police arrived, Don S. admitted that was true.

In addition to evidence of domestic violence, there was also evidence that Don S. has a pattern of abusing marijuana. On March 1, 2014, Don S. was arrested for possession of marijuana. During the 2014 Department investigation, he admitted to the caseworker that he used marijuana regularly. His stepdaughter also told the caseworker that he used marijuana daily. With regard to this case, the caseworker testified that on January 18, 2018, when Don S. signed his family service plan, she explained to him that he had to drug test monthly and that he needed to take a drug test by 4 p.m. the following day. On January 22, 2018, Don S. had not taken his drug test, so the caseworker called him. He said that he had not taken his drug test because he did not have a copy of the service plan. The caseworker took him a copy of the service plan and told him to take a drug

test by 4 p.m. the following day. Again, Don S. did not take a drug test. When the caseworker met with him in February 2018, they discussed his failure to drug test, and he said that he "didn't want to get too deep in services" until he was sure he was the father. His drug test in February was negative. His urinalysis in March was negative, but his hair follicle test was positive for marijuana. At trial, Don S. was asked about the intake form he filled out with the licensed counselor in this case. He agreed that when asked if he used marijuana, he responded, "Age at first use: at 19; in early 20s, smoked daily for about one year; last use" was in January 2018. He was then asked if he would admit that "smoking marijuana daily for about one year would qualify as a substance use problem." Don S. responded, "Well, yes."

Police reports detailing the above incidents of assault and drug use were admitted into evidence and considered by the jury. After the jury returned a verdict in favor of terminating Don S.'s parental rights, the trial court signed an order terminating Don S.'s parental rights pursuant to sections 161.001(b)(1)(C), (D), (E), (N), and (O), and section 161.001(b)(2) of the Texas Family Code. Don S. now appeals.

## STANDARD OF REVIEW

To terminate parental rights pursuant to section 161.001 of the Texas Family Code, the Department has the burden to prove by clear and convincing evidence that parental rights should be terminated pursuant to one of the predicate grounds in subsection 161.001(b)(1) and that termination of parental rights is in the best interest of the child. TEX. FAM. CODE § 161.001(b)(1), (2). In reviewing the legal sufficiency of the evidence to support these findings, we look "at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). In reviewing the factually sufficiency of the evidence, we consider disputed or conflicting evidence. *Id.* at 345. "If,

in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). Under these standards, the factfinder is the sole judge of the weight and credibility of the evidence. *Id*.

We review a conservatorship decision under a less stringent standard than the one used to review a termination decision. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). Conservatorship decisions are subject to review only for an abuse of discretion, and reversal is proper only if the decision is arbitrary and unreasonable. *Id*.

### PREDICATE GROUNDS

Don S.'s parental rights were terminated pursuant to the following predicate grounds under section 161.001(b)(1): subsections (C), (D), (E), (N), and (O). *See* TEX. FAM. CODE § 161.001(b)(1)(C), (D), (E), (N), (O). Even though only one predicate ground may support the trial court's order of termination, because a termination finding under subsection (D) or (E) may serve as the basis for a future termination of parental rights proceeding, due process requires that we address any appellate issue regarding the sufficiency of the evidence of a trial court's finding under either (D) or (E). *See In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019).

*A. Subsection (D)*

Subsection (D) allows termination of parental rights if, along with a best-interest finding, the factfinder finds by clear and convincing evidence that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(D). Subsection (D) "cannot constitute the basis for termination if the parent was unaware of the endangering environment." *In re N.F.*, No. 09-19-00435-CV, 2020 WL 2070286, at *21 (Tex. App.—

Beaumont Apr. 30, 2020, no pet. h.) (mem. op.); *see also In re C.M.C.*, 554 S.W.3d 164, 171-72 (Tex. App.—Beaumont 2018, no pet.). Additionally, "[k]nowledge of paternity is a prerequisite to a showing of knowing placement of a child in an endangering environment" under subsection (D). *In re C.J.G.*, No. 04-19-00237-CV, 2019 WL 5580253, at *3 (Tex. App.—San Antonio 2019, no pet.) (quoting *A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 713 (Tex. App.—El Paso 2012, no pet.)) (mem. op.); *see also In re M.J.M.L.*, 31 S.W.3d 347, 351 (Tex. App.—San Antonio 2000, pet. denied) (same).

Don S. argues there is legally insufficient evidence to support the finding under subsection (D), because he had no knowledge of his paternity or the conditions N.N.M. was living in before her removal. There is evidence in the record that Don S. was aware of both Ashley M.'s pregnancy and the possibility that he was the father of her future child. However, there is no evidence that he had any knowledge or awareness of the conditions in which N.N.M.'s was living until he was contacted by the Department, well after the time of removal. *See In re N.F.*, 2020 WL 2070286, at *21 (explaining that subsection (D) cannot be basis for termination if the parent was unaware of the endangering environment). Therefore, we hold the evidence is legally insufficient to support the finding under subsection (D).

*B. Subsection (E)*

Subsection (E) allows termination of parental rights if, along with a best-interest finding, the factfinder finds by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E). Under both subsections (D) and (E), "endanger" means "to expose a child to loss or injury, or to jeopardize a child's emotional or mental health." *In re C.J.G.*, 2019 WL 5580253, at *3 (citing *In re M.C.*, 917 S.W.2d

268, 269 (Tex. 1996)). "However, there are some distinctions in the application of subsections (D) and (E)." *Id*. (citation omitted).

First, while "[k]nowledge of paternity is a prerequisite to a showing of knowing placement of a child in an endangering environment under" subsection (D), knowledge of paternity is not "a prerequisite to a showing of a parental course of conduct which endangers a child under" subsection (E) because subsection (E) "requires only that the parent's conduct endanger the child." *Id*. (citing *In re Stevenson*, 27 S.W.3d 195, 202 (Tex. App.—San Antonio 2000, pet. denied)); *see also A.S.*, 394 S.W.3d at 713 (same). Therefore, "a father's conduct prior to the establishment of his paternity can be considered" as evidence of an endangering course of conduct under subsection (E). *In re C.J.G.*, 2019 WL 5580253, at *3 (quoting *In re Stevenson*, 27 S.W.3d at 202). "Courts may consider criminal offenses and incarceration that occurred before paternity has been adjudicated in reviewing endangering conduct." *In re A.R.M.*, No. 14-13-01039-CV, 2014 WL 1390285, at *7 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (mem. op.); *In re S.F.*, 32 S.W.3d 318, 321-22 (Tex. App.—San Antonio 2000, no pet.) (considering father's conduct before he signed affidavit of paternity and holding father's criminal behavior before imprisonment and continued misbehavior during prison term showed course of conduct detrimental to the child).

Second, while termination under subsection (D) is permitted based upon only a single act or omission, termination under subsection (E) may not rest on a single act or omission; instead, it must be "a voluntary, deliberate, and conscious course of conduct." *In re C.J.G.*, 2019 WL 5580253, at *3 (quoting *Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)). Finally, "[i]n evaluating endangerment under subsection (D), we consider the child's environment before the Department obtained custody of the child"; however, under subsection (E), "courts may consider conduct *both before and after* the Department removed the

child from the home." *Id*. (quoting *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)) (emphasis added).

Don S. argues that the evidence is insufficient under subsection (E) because he did not know about N.N.M.'s parentage or the conditions under which she was living before her removal, and after her removal, he "was visiting N.N.M., completing numerous services, maintaining a residence, and working hard at his two jobs." However, Don S. fails to recognize that evidence of a pattern of behavior can be sufficient to support an endangerment finding under subsection (E). *See In re A.R.M.*, 2014 WL 1390285, at *7. While "[a]n endangerment finding often involves physical endangerment," "the statute does not require that the parent's conduct be directed at the child or that the child suffer actual injury." *In re K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at * 5 (Tex. App.—San Antonio Aug. 21, 2019, pet. denied) (mem. op.). "Rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone." *Id*. (citation omitted).

"Conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *Id*. "Thus, evidence of illegal drug use by a parent and its effect on a parent's life and her ability to parent may establish an endangering course of conduct under subsection (E)." *Id*.; *see In re J.O.A.*, 283 S.W.3d at 346 (holding evidence sufficient to support finding of endangerment even though father had made significant recent improvements because "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices"); *In re K-A.B.M.*, 551 S.W.3d 275, 287 (Tex. App.—El Paso 2018, no pet.) ("A parent's use of drugs and its effect on his or her ability to parent may qualify as an endangering course of conduct."); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("Because it exposes the child to the possibility that the parent may be impaired or

imprisoned, illegal drug use may support termination under section 161.001(1)(E).”). Thus, a pattern of drug abuse will support a finding of conduct endangering a child even if there is no evidence that the drug use injured the child. *Vasquez v. Tex. Dep’t of Protective & Regulatory Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

Similarly, “[d]omestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment.” *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *see also In re S.R.*, 452 S.W.3d at 361. Additionally, when determining if a child is at risk for abuse or neglect by her parent, the parent’s treatment of other children must be considered: “Part of [the risk] calculus includes the harm suffered or the danger faced by other children under the parent’s care.” *In re E.C.R.*, 402 S.W.3d 239, 248 (Tex. 2013); *see also In re P.N.T.*, 580 S.W.3d 331, 356 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) (quoting *In re E.C.R.*, 402 S.W.3d at 248).

Further, under subsection (E), a court may “consider actions and inactions occurring both before and after a child’s birth to establish a ‘course of conduct.’” *In re A.L.H.*, 515 S.W.3d 60, 91 (Tex. App.—Houston [14th Dist.] 2017, pet. denied); *see also In re S.M.*, 389 S.W.3d 483, 491–92 (Tex. App.—El Paso 2012, no pet.) (same). “The specific danger to the children need not be established independently, but rather may be inferred from the parental misconduct.” *Porter v. Tex. Dep’t of Protective & Regulatory Servs.*, 105 S.W.3d 52, 58 (Tex. App.—Corpus Christi–Edinburg 2003, no pet.).

The evidence at trial showed that Don S. had a pattern of not visiting his children, not financially supporting his children, abusing marijuana, and committing domestic violence. At trial, Don S. admitted to having smoked marijuana daily in the past and acknowledged that daily drug use indicated a drug problem. He also admitted that he had been arrested in the past for drug possession. There was also evidence he smoked marijuana regularly in the home where his

stepdaughters lived, but felt that his behavior was acceptable because he told them to go outside. Don S. also agreed at trial that during the pendency of this case, he did not submit to the first two drug tests requested by the caseworker in Lubbock. The jury could reasonably have inferred from his failure to attend drug testing that he was avoiding testing because he was using illegal drugs. The jury could have found further support of drug use when after he finally submitted to a hair follicle test it was positive for marijuana. Thus, there was evidence that Don S. had a history of abusing marijuana and was still abusing drugs up until a few months before trial.

In addition to his drug use, there was evidence that Don S. had committed acts of domestic violence against his estranged wife, his mother-in-law, and his former girlfriend. He acknowledged at trial that he had prior arrests for domestic violence and had prior CPS history involving concerns of domestic violence. His estranged wife reported that he physically abused her and had even knocked her out, but said he had not done so in front of her children. One of the children, however, reported having seen Don S. push her grandmother and said she was fearful her grandmother would be injured.

Further, Don S. has a pattern of not supporting his children and not visiting them. The Department became involved when two of his children were found living in a car with their mother who could not afford to feed or clothe them. When Don S. was told about his children being homeless, he took no action and did not contact the Department again. In the present case, Don S. knew Ashley M. was pregnant but took no action to keep in contact with her or find out if she had given birth to the baby.

Viewing all the evidence in the light most favorable to the jury's verdict, we conclude a reasonable trier of fact could have formed a firm belief or conviction that the evidence of Don S.'s past and current conduct supported a reasonable inference that he "engaged in conduct (or knowingly placed the child with persons who engaged in conduct) which endangers the physical

or emotional well-being of the child." Thus, we hold the evidence is legally sufficient to support the jury's finding under subsection (E).

With regard to factual sufficiency, there is some evidence that Don S. has not used marijuana in the three months before trial and that he had recently obtained employment and housing. However, after considering the entire record, including any disputed or contrary evidence, we conclude the evidence is factually sufficient to support the jury's finding under subsection (E).[3]

### CHILD'S BEST INTEREST

Having determined there is legally and factually sufficient evidence to support termination under subsection (E), we must now determine whether the evidence supports the jury's finding that termination of Don S.'s parental rights is in N.N.M.'s best interest. Under Texas law, there is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). In determining whether the child's parent is willing and able to provide the child with a safe environment, the factors set out in section 263.307 of the Family Code should be considered. *See* TEX. FAM. CODE § 263.307(b).[4] In addition to these

---

[3] Having determined that there is legally and factually sufficient evidence to support Don S.'s termination under subsection (E), we need not consider whether there is also sufficient evidence to support termination under subsections (C), (N), and (O). *See In re M.R.D.*, No. 04-19-00524-CV, 2020 WL 806656, at *10 n.4 (Tex. App.—San Antonio Feb. 9, 2020, pet. denied) (explaining only one predicate ground needs to support an order of termination).

[4] These factors include (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with: (A) minimally adequate health and nutritional care; (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and (F) an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b).

statutory factors, in considering the best interest of the child, a factfinder may also consider the nonexclusive list of factors set forth by the Texas Supreme Court in *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).[5] The *Holley* factors are neither all-encompassing nor does a court need to find evidence of each factor before terminating the parent-child relationship. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Finally, in determining whether termination of the parent-child relationship is in the best interest of a child, a factfinder may judge a parent's future conduct by her past conduct. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied)

There was evidence at trial that N.N.M. has specialized needs and care as a result of the injuries she suffered. N.N.M. suffered from bilateral subdural hemorrhages, or bleeding in the brain. She also had two separate leg fractures and was diagnosed with a condition known as failure to thrive. She was underweight and had to be placed at a respite center for six months. As she was transitioned to foster care, her foster mother was required to take her to frequent doctor visits in order to monitor her weight, as well as her overall progress due to her failure to thrive diagnosis. Kathleen Buckley, a registered pediatric nurse practitioner, testified that based on her interactions with the foster mom, she felt the foster mom was very invested in doing well for N.N.M. by following all recommendations. According to Buckley, there had also been concerns for developmental delays involving speech, physical therapy and fine motor skills. Once N.N.M. was placed into foster care, her developmental services were established and consistent. N.N.M. was referred to the Early Childhood Intervention program (ECI) so that she could be treated by a primary care physician and a neurologist for seizures that she had experienced and for which she

---

[5] These factors include, but are not limited to, the following: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the child's best interest; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *In re E.C.R.*, 402 S.W.3d at 249 n.9 (citing *Holley*, 544 S.W.2d at 371-72).

was prescribed medication. According to Buckley, after N.N.M. was placed with her foster family, she had excellent consistent weight gain. N.N.M. will continue to need developmental services for the foreseeable future and will need to live in an environment that is stimulating and attentive to her specialized needs for both cognitive and fine motor skills.

Megan Sparks, an early intervention specialist with ECI, testified that she worked with the foster parents to establish various exercises to help N.N.M. improve her motor skills. She testified that she saw significant progress once N.N.M. was placed in the care of the foster family. As a result of N.N.M.'s progress, she was discharged from the program at twenty months of age. Sparks attributed N.N.M's progress to "100 percent of [the foster parents'] time, 100 percent of the day to continue to get her back to where she needed to be."

Alaida Camarillo, a conservatorship worker with the Department, testified that N.N.M. began transitioning to her foster home in April 2017 and was placed there full-time in June 2017. When Camarillo visited the foster home, she determined the home had adequate space for N.N.M. and her sister, along with all the items they might need. She was able to observe N.N.M. in the foster home and described a loving and supportive environment in which N.N.M. appeared very bonded to the foster family. Although the foster mom has previously been employed outside the home, once N.N.M. and her sister were placed in the home, she chose to leave her employment and become a stay-at-home mom. Camarillo testified that Don S. had no bond with N.N.M., and although allowed two visits per month beginning in March, which at the time of trial would have been a total of six possible visits, Don S. availed himself of only two. Don S. claimed his limited number of visits was due to his recent employment and financial situation.

Caseworker Alicia Boswell testified that from the time she met Don S. in December 2017 to April 2018, he had moved residences four times. According to Boswell, other than his plan to have a girlfriend who currently lived in Amarillo move down to help him with N.N.M., he had no

plan for a doctor, a dentist, a school, or babysitters for N.N.M. His plan for transportation involved using his brother's vehicle; however, he admittedly did not have a valid driver's license because of outstanding warrants for traffic tickets. Boswell testified Don S. did not mention any other support system. When Boswell followed up with Don S. the next month, he was able to provide her with a list of potential doctors, dentists, and daycare centers. Boswell also met his girlfriend, Crystal. However, because of Don S.'s history of job and housing instability, and because the changes he made were very recent, Boswell testified she still had concerns as to whether he would be able to sustain the changes he had made.

Abigail Perez, Don S.'s therapist, testified that although Don S. was referred to her in January 2018, he did not begin to meet with her until March 2018. While Perez also shared her concerns regarding Don S.'s lack of stable employment, housing and transportation, what was even more concerning to her was Don S.'s lack of communication and support of his other five children. She noted that Don S. blamed his inability to have close relationships with his other children on the children's mothers. Perez testified that during the time Don S. was in therapy, he was unable to come up with a solid plan for daycare or resolve other concerns such as not having a valid driver's license.

N.N.M.'s foster mom testified that at the time of trial, N.N.M. and her sister had been with her family for almost a year. During that time, they had all bonded as a family. The two girls called her "Mama" or "Mommy" and her husband "Dad" or "Daddy." Because N.N.M. was only four months old at the time she was removed, her foster family is the only home that she has ever known. The foster mom testified that although she had previously held a full-time job, she chose to leave her job in exchange for staying at home with N.N.M. and her sister. According to the foster mom, it was her and her husband's goal to adopt both N.N.M. and her sister. There was evidence at trial that N.N.M. had special needs and that she may continue to have hearing

problems, as well as neurological issues. The foster mom testified that she and her husband are committed to N.N.M.'s medical care, to taking her to all follow-up medical appointments and following any recommendations.

In support of his argument that the evidence is legally and factually insufficient to support the finding that termination is in N.N.M.'s best interest, Don S. argues that he has recently obtained employment and housing. However, at the time he was contacted about this case, he was unemployed. Further, because he was living with his brother, a convicted felon, his housing was not suitable for N.N.M. As noted previously, Don S. has a long history of instability in his employment and housing. He also has a long history of not supporting his children financially and owes over $40,000 in child support. Further, while he acknowledges that he has limited relationships with his other five children, he refuses to take any responsibility and places the blame on the mothers of his children. Additionally, Don S. argues that his completion of his service plan supports N.N.M. being placed in his care. However, he acknowledged during his testimony that the first time he became aware of N.N.M.'s specialized medical needs and the challenges she faces is when he heard testimony at trial about N.N.M.'s condition. Finally, the evidence of Don S.'s history of drug abuse and domestic violence supported the jury's finding that termination of Don S.'s parental rights was in N.N.M.'s best interest.

Having reviewed the record and considered all the evidence in the appropriate light for each standard of review, we conclude the jury could have formed a firm belief or conviction that termination of Don S.'s parental rights was in the child's best interest. *See In re J.O.A.*, 283 S.W.3d at 344-45.

### CONSERVATORSHIP

In his final issue, Don S. argues the jury abused its discretion in finding that the foster parents should be appointed managing conservators. In conformity with the jury's verdict, the trial

court's order appoints the foster parents as permanent managing conservators of N.N.M. Because we have determined that the evidence is legally and factually sufficient to support termination of Don S.'s parental rights, Don S. no longer has any legal rights with respect to N.N.M. and cannot challenge the portion of the termination order that relates to appointment of conservators. *See In re C.J.Y.*, No. 04-20-00009-CV, 2020 WL 3441248, at *7 (Tex. App.—San Antonio June 24, 2020, pet. denied); *In re M.R.D.*, 2020 WL 806656, at *9; *In re L.T.P.*, No. 04-17-00094-CV, 2017 WL 3430894, at *6 (Tex. App.—San Antonio 2017, pet. denied).

## CONCLUSION

Because there is no evidence to support the jury's finding under subsection (D), we modify the trial court's order of termination to delete that finding. As modified, we affirm the trial court's order terminating Don S.'s parental rights.

Liza A. Rodriguez, Justice