**Affirmed and Opinion Filed July 9, 2021**



In The

### Court of Appeals
### Fifth District of Texas at Dallas

_____

### No. 05-21-00043-CV
_____

## IN THE INTEREST OF R.B., A CHILD

**On Appeal from the 199th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 199-30016-2019**

## MEMORANDUM OPINION
Before Justices Molberg, Reichek, and Nowell
Opinion by Justice Molberg

Father and Mother appeal the trial court's final order terminating their parental rights to their son, R.B., after a bench trial. Both challenge the legal and factual sufficiency of the evidence to support the trial court's findings that each engaged in the conduct proscribed by family code sections 161.001(b)(1)(D), (E), and (O) and that termination of their parent-child relationships was in R.B.'s best interest. *See* TEX. FAM. CODE §§ 161.001(b)(1)(D), (E), (O); 161.001(b)(2). Mother also appeals the appointment of the Texas Department of Family and Protective Services (the Department) as R.B.'s permanent non-parent managing conservator. We affirm the trial court's judgment for the reasons below.

# I. BACKGROUND

This case involves the parent-child relationships between L.B. (Father), M.E. (Mother), and R.B. (Child). R.B. was born in January 2018.

The Department filed an original petition for protection and temporary managing conservatorship of R.B. on February 4, 2019. The eighteen-page affidavit accompanying the original petition stated, among other things, that Mother had recently told law enforcement that Father abused her and that R.B., vulnerable due to his age, had been removed by CPS in a previous case. The affidavit also referred to Mother's extensive mental health issues and stated she had been taken by law enforcement to the hospital. The affidavit also listed several significant concerns by the Department, including, but not limited to, reports of Father's domestic violence and bizarre punishment of Mother in the home, which was suspected to be in front of R.B.; Father's recent arrest for assaulting Mother; and Mother's mental health condition. The affidavit included information about various referrals and the history between Department, Mother, Father, and R.B. beginning in November 2018 and continuing through the date of the affidavit.

The trial court signed the ex parte temporary order on February 4, 2019. In that order, the court appointed the Department as R.B.'s temporary managing conservator and included findings that there was an immediate danger, that continuation in the home would be contrary to R.B.'s welfare, and that there was no time consistent with the nature of the emergency to make reasonable efforts to

prevent or eliminate the need for R.B.'s removal. The ex parte order also provided the Department with various rights—including the right to have physical possession of R.B. The Department removed R.B. and placed him in foster care. The trial court also signed orders appointing attorneys ad litem for Father, Mother, and R.B. and appointing Collin County CASA as guardian ad litem for R.B.[1]

Ten days later, the court extended the ex parte order to February 21, 2019, and on that date, the court signed a temporary order requiring parents to perform certain tasks and participate in certain services. Among other things required by that temporary order, (1) both parties were to maintain stable, suitable housing and suitable, stable, and legal employment; (2) Father was to participate in a psychological evaluation as recommended by CPS and in individual counseling; and (3) Mother was to participate in a psychological evaluation if one had not been conducted in the past twelve months; participate in a psychiatric evaluation or provide a psychiatric evaluation within 180 days of the order; participate in individual counseling; take all medication as prescribed; follow any treatment plan recommended by her current mental health provider; provide CPS with a list of all of her prescription medications; and notify CPS in writing of any medication changes.

---

[1] Later, on February 24, 2020, the court also appointed a guardian ad litem for Mother.

On July 9, 2019, the court signed a permanency hearing order stating, in part, that Father and Mother had not complied with the case plan of services prepared for the family and R.B. to the extent that R.B. could be returned home and that Father and Mother were not then able or willing to provide R.B. a safe environment and a continuing need existed for placement of R.B. in foster care. In addition to the participation in other services the court already required for Father, in the July 9, 2019 order and permanency hearing orders signed thereafter,[2] the court also ordered Father to participate in a batterers intervention and prevention program (BIPP).

On November 5, 2019, the Department filed an amended petition seeking, among other things, termination of Father's and Mother's parent-child relationship with R.B. In addition to other alleged acts proscribed under family code section 161.001(b)(1), the Department alleged that Father and Mother had both engaged in conduct described in sections 161.001(b)(1)(D), (E), and (O) and that termination of Father's and Mother's parent-child relationship with R.B. was in R.B.'s best interest. The Department also sought appointment as R.B.'s permanent managing conservator if R.B. could not safely be reunified with either parent or permanently placed with a relative or other suitable person.

By the time trial began, both parents had filed pleadings that included general denials. Mother's pleading also included a counter-petition alleging that she and

---

[2] Permanency hearing orders were signed on July 9, 2019, November 5, 2019, February 18, 2020, June 29, 2020, and December 18, 2020.

Father were separated and had never legally married and that it was in R.B.'s best interest for Mother to be appointed as R.B.'s sole managing conservator.

The trial court conducted a two-day bench trial through Zoom electronic video conferencing on January 19, 2021, and January 20, 2021. During trial, the judge heard from twenty-seven witnesses, including Mother but not Father, and admitted roughly ninety exhibits.

During the trial, many witnesses testified about their concerns regarding domestic violence between Father and Mother and regarding Mother's mental health, based in part on their observations and Mother's statements to them about various events from 2018 through 2020.

However, when Mother testified, she denied any abuse occurred. According to the record before us, she did so while testifying by video from Father's home, with Father in the same room, and while Mother and Father appeared together on-screen. Despite this, Mother testified the two were no longer living together and that she was living with a family friend.

Besides Mother, the other trial witnesses included several Department and law enforcement personnel, various healthcare providers for Mother, Mother's former foster mother, Mother's guardian ad litem, and a volunteer for CASA, the court-appointed guardian ad litem for R.B. Generally, the exhibits included pleadings, temporary orders, family plans, visitation plans, evaluations, permanency reports,

Mother's healthcare records, various other records, and photographs, several of which depicted bruising and other marks on Mother's body at various times.

At the conclusion of trial, the court rendered judgment terminating Father's and Mother's parent-child relationship with R.B. under family code sections 161.001(b)(1)(D), (E), and (O) and made findings that doing so was in R.B.'s best interest. When rendering judgment, the trial judge stated, in part:

> I know that Mom disagrees. I know that Dad disagrees. But there is evidence that Mom has been a victim of physical abuse, which as I said both Mom and Dad denied, but also extreme emotional abuse.
>
> . . . .
>
> So even though we have evidence one way, and then testimony a different way, as the fact finder, I believe that domestic violence has occurred. I believe that emotional abuse, controlling, all those things that were testified to, I believe that Mom has had to endure and experience that.
>
> . . . .
>
> I'm looking at all the bruises, listening to all the reports, the police calls, the neighbors, all those things. And as [Department's counsel] pointed out, the consistency about the closet and all these things. And also connecting that through one of the other CPS witnesses that testified about a different woman whose experience was very similar to what Mom's experience is as it relates to the allegations of abuse, both emotional and physical. So the Court cannot overlook those things.
>
> . . . .
>
> I simply cannot ignore the volume of evidence that points to this child, his inability to be safe. I cannot ignore the high risk if I were to place him back home. And, as I said, I have placed him back home before. And the same behaviors that caused him to come into care are the same behaviors and the evidence I'm listening to now, two years later. So though we've had services, we haven't modified behaviors, which is what has to happen before children can go back home to a safe and

stable environment.  So, for those reasons, all of the evidence, all of the testimony that the Court has reviewed and heard, I will terminate the parent-child relationship between the biological father and the child, subject of this suit, on the grounds (D), (E), and (O) under 161.001.  Also making a finding on the record that it's in the child's best interest to do so.  With respect to the mother . . . and the child, subject of this suit. The Court will also terminate that parent-child relationship on the grounds of (D), (E), and (O) under 161.001.  And also make a finding that it's in the child's best interest to do so.

The trial judge signed the final order on February 5, 2021.  Among other things, the final order stated that the trial court found by clear and convincing evidence that Father and Mother each (1) "knowingly placed or knowingly allowed [R.B.] to remain in conditions or surroundings which endanger [his] physical or emotional well-being," (2) "engaged in conduct or knowingly placed [R.B.] with persons who engaged in conduct which endangers [his] physical or emotional well-being," and (3) "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of [R.B.] who has been in the permanent or temporary managing conservatorship of the [Department] for not less than nine months as a result of [his] removal from the parent under Chapter 262 for the abuse or neglect of [R.B.]."  *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (O).  The order also stated the trial judge found by clear and convincing evidence that it was in R.B.'s best interest to terminate the parent-child relationship between each parent and R.B.  *See id*. §§ 161.001(b)(2).  Finally, the trial court's final order stated that appointment of a parent as a managing conservator was not in R.B.'s best interest because it would significantly impair his physical and

emotional well-being and, as a result, appointed the Department as R.B.'s permanent non-parent managing conservator.

Both parents appeal.[3]

## II. TRIAL COURT'S JURISDICTION

Jurisdiction has not been questioned by the parties, and our own review of the record confirms that the usual dismissal deadlines for the trial court's jurisdiction were extended, in part, due to emergency orders regarding the COVID-19 pandemic.

Initially, under family code section 263.401(a), the trial court's jurisdiction was to terminate on February 10, 2020, the first Monday after the first anniversary of February 4, 2019, when the court rendered a temporary order appointing the Department as R.B.'s temporary managing conservator, unless the trial court had commenced trial on the merits or granted an extension under subsection (b) or (b-1). *See* TEX. FAM. CODE § 263.401(a).

In an order signed November 22, 2019, the trial court extended the original dismissal date under section 263.401(b). *See id.* § 263.401(b). In that order, the trial court (1) found that extraordinary circumstances necessitated R.B. remaining in the temporary managing conservatorship of the Department, (2) found that continuing

---

[3] Father and Mother both filed notices of appeal before the trial court signed the final order. Mother also filed a motion for new trial regarding the legal and factual sufficiency of the evidence to support the court's findings under sections 161.001(b)(1) and 161.001(b)(2). The trial court did not rule on Mother's motion. While Father did not file a motion for new trial raising legal or factual sufficiency issues in the trial court, he was not required to do so in this civil nonjury matter. TEX. R. APP. P. 33.1(d) ("In a civil nonjury case, a complaint regarding the legal or factual insufficiency of the evidence . . . may be made for the first time on appeal in the complaining party's brief.")

the Department's appointment as his temporary managing conservator was in R.B.'s best interest, and (3) extended the dismissal date to August 8, 2020, 180 days after the original dismissal date. *Id*.

On June 29, 2020, the trial court extended the dismissal date to November 22, 2020, based on the Texas Supreme Court's seventeenth emergency order regarding the COVID-19 state of disaster, which was issued on May 26, 2020. *See Seventeenth Emergency Order Regarding COVID-19 State of Disaster*, 609 S.W.3d 119 (Tex. 2020). The supreme court's seventeenth emergency order stated, in part, that "all courts in Texas may in any case, civil or criminal . . . and must to avoid risk to court staff, parties, attorneys, jurors, and the public . . . in all proceedings under Subtitle E, Title 5 of the Family Code, specifically including but not limited to Section 263.401(b) . . . extend the dismissal date for any case previously retained on the court's docket for an additional period not to exceed 180 days from the date of [the] Order." *Id*. at 120 (para. 3.b.(ii)). In addition to extending the dismissal date, the trial court's June 29, 2020 order set the case for trial on October 5-6, 2020.

About a week before trial was to begin, Father moved for a continuance and an extension of the dismissal date, with no opposition from the other parties. Father's motion noted the upcoming trial setting, stated his counsel had tested positive for COVID-19, and asked that the trial date be continued and that the dismissal deadline be extended to March 17, 2021, 180 days after the supreme court's September 18, 2020 twenty-sixth emergency order regarding the COVID-19

–9–

state of disaster. *See Twenty-Sixth Emergency Order Regarding COVID-19 State of Disaster*, 609 S.W.3d 135 (Tex. 2020). The supreme court's order included the same language quoted above from the seventeenth emergency order. *Id.* at 135 (para. 2.b.(i)).

On October 2, 2020, the trial court signed an order that granted Father's motion, extended the dismissal deadline to March 17, 2021, and set the case for trial on January 19-20, 2021. The trial court's order cited the supreme court's twenty-sixth emergency order and stated that the extension of the dismissal date and trial date was "necessary to avoid risk to court staff, parties, attorneys, jurors, and the public" and that "continuing the appointment of the Department as temporary managing conservator is in [R.B.'s] best interest."

Under these circumstances, the trial court had jurisdiction when the case was tried. *See E.N. v. Tex. Dep't of Family & Protective Servs.*, No. 03-21-00014-CV, 2021 WL 2460625, at *5 (Tex. App.—Austin June 17, 2021, no pet. h.) (mem. op.) (discussing family code section 263.401 and supreme court's emergency orders relating to COVID-19 state of disaster and stating "[t]his would theoretically have allowed the district court to extend the case indefinitely by granting an extension under each successive order" and noting that, once the supreme court's authorizations stopped, each case where a court had granted an extension would have to be tried before the automatic dismissal date.)

The involuntary termination of parental rights involves fundamental constitutional rights. *In re G.M.*, 596 S.W.2d 846 (Tex. 1980). A natural parent's desire for—and right to—the companionship, care, custody, and management of his or her child is an interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982). A termination order is final and irrevocable, divesting for all time that natural right as well as all legal rights, privileges, duties, and powers between the parent and child except for the child's right to inherit. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see In re M.S.*, 115 S.W.3d 534, 549 (Tex. 2003) (referring to termination of a parent's right to his or her child as "traumatic, permanent, and irrevocable.")

Both the Texas Family Code and federal due process require that grounds for termination of parental rights be proved by clear and convincing evidence. TEX. FAM. CODE § 161.001; *Santosky*, 455 U.S. at 753–54. A trial court may order termination of a parent's rights to a child under section 161.001 if the court finds by clear and convincing evidence that termination is in the child's best interest and that one or more of the statutory predicate grounds for termination have been satisfied. *In re Z.N.*, 602 S.W.3d 541, 543 (Tex. 2020) (per curiam); TEX. FAM. CODE § 161.001(b).

"'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth

of the allegations sought to be established." TEX. FAM. CODE § 101.007. This heightened standard of review requires us to strictly construe involuntary termination statutes in favor of the parent. *In re Z.N.*, 602 S.W.3d at 545 (citations omitted); *Holick*, 685 S.W.2d at 20.

This heightened standard of proof gives rise to a heightened standard of appellate review. *In re Z.N.*, 602 S.W.3d at 545 (citing *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019)). For both legal and factual sufficiency challenges, we consider all the evidence, defer to the factfinder's credibility determinations, and determine whether the factfinder could form a firm belief or conviction that the grounds for termination were proven. *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). Factfinders may draw inferences regarding the evidence, as long as they are "reasonable and logical." *In re Z.N.*, 602 S.W.3d at 545 (citing *In re E.N.C.*, 384 S.W.3d 796, 804 (Tex. 2012)).

The distinction between legal sufficiency review and factual sufficiency review "lies in the extent to which disputed evidence contrary to a finding may be considered." *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

In reviewing legal sufficiency of a finding to support termination, we "'look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that the finding was true.'" *In re Z.N.*, 602 S.W.3d at 545 (quoting *In re J.F.C.*, 96 S.W.3d at 266). We assume the trial court resolved disputed facts in favor of its finding if a

–12–

reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). After this review, if we determine that "'no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true,'" then we "'must conclude that the evidence is legally insufficient'" for the trial court's finding. *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266).

In reviewing the factual sufficiency of evidence supporting a termination finding, we ask whether, in light of the entire record, the evidence is such that a factfinder could reasonably form a firm conviction about the truth of the allegation against the parent. *In re A.B.*, 437 S.W.3d 498, 502–03 (Tex. 2014) (citing *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). "'If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, the evidence is factually insufficient.'" *Id.* at 503 (quoting *In re J.F.C.*, 96 S.W.3d at 266). In a factual sufficiency review, we "consider whether disputed evidence is such that a reasonable a factfinder could not have resolved that disputed evidence in favor of its finding." *In re J.F.C.*, 96 S.W.3d at 266.

Finally, we include two other important considerations affecting our review. First, while we fully appreciate the "constitutional magnitude" afforded parental rights, we also recognize the imperative that we not sacrifice the "emotional and

physical interests of the child . . . merely to preserve that right." *In re C.H.*, 89 S.W.3d at 26.

Second, in *A.B.*, the supreme court observed, "While parental rights are of a constitutional magnitude, they are not absolute," and, despite the heightened review standards, courts of appeals "must nevertheless still provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *Id.* (citing *In re J.L.*, 163 S.W.3d 79, 86–87 (Tex. 2005)).

## IV. ANALYSIS

Father and Mother each raise four issues, and most of those issues overlap.[4] For purposes of our analysis, we group them into three categories: (1) their challenges to the legal and factual sufficiency of the evidence to support the trial court's findings under sections 161.001(b)(1)(D), (E), and (O); (2) their challenges to the legal and factual sufficiency of the evidence to support the trial court's findings that termination of their parental rights was in R.B.'s best interest under

---

[4] In Father's four issues, he argues the evidence was legally and factually insufficient to support the trial court's finding that (1) he engaged in the conduct covered by family code section 161.001(b)(1)(D), (2) he engaged in the conduct covered by family code section 161.001(b)(1)(E), (3) he engaged in the conduct covered by family code section 161.001(b)(1)(O), and (4) termination of his parental rights was in R.B.'s best interest under section 161.001(b)(2). In Mother's first three issues, she argues the evidence was legally and factually insufficient to support (1) termination of her parental rights under family code 161.001(b)(1)(O); (2) termination of her parental rights under family code sections 161.001(b)(1)(D) or (E); and (3) a finding that termination of her parental rights was in R.B.'s best interest under section 161.001(b)(2). Finally, in her fourth issue, Mother argues the trial court abused its discretion in appointing the Department, a nonparent, as R.B.'s conservator.

–14–

section 161.001(b)(2); and (3) Mother's challenge to the trial court's appointment of the Department as R.B.'s permanent non-parent managing conservator.

## A.     Predicate Acts Under Section 161.001(b)(1)

Section 161.001(b)(1) of the family code lists twenty-one predicate acts that, if found by clear and convincing evidence, allow a court to terminate a parent-child relationship if the court also finds that termination of the relationship is in the child's best interest. *See* TEX. FAM. CODE §§ 161.001(b)(1)(A)–(U); 161.001(b)(2). Only one predicate finding is necessary to support a judgment of termination of parental rights when a finding is also made that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (citations omitted).

In this case, the court found by clear and convincing evidence that each parent engaged in the predicate acts proscribed by 161.001(b)(1)(D), (E), and (O). *See* TEX. FAM. CODE §§ 161.001(b)(1)(D), (E), (O). Specifically, the trial court concluded Father and Mother each (1) "knowingly placed or knowingly allowed [R.B.] to remain in conditions or surroundings which endanger [his] physical or emotional well-being," (2) "engaged in conduct or knowingly placed [R.B.] with persons who engaged in conduct which endangers [his] physical or emotional well-being," and (3) "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of [R.B.] who has been in the permanent or temporary managing conservatorship of the [Department] for not less than nine months as a result of [his] removal from the parent under Chapter 262

–15–

for the abuse or neglect of [R.B.]." Both parents argue the evidence is legally and factually insufficient to support these findings. We disagree with both parents.

### 1. Applicable Law Under Subsections (D) and (E)

In Father's first and second issues and in Mother's second issue, each parent argues the evidence was legally and factually insufficient to support the trial court's findings under sections 161.001(b)(1)(D) and (E). We consider these two subsections together because the evidence on them is interrelated.[5]

Parental rights may be terminated under section 161.001(b)(1)(D) if clear and convincing evidence supports a finding that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(D). Under section 161.001(b)(1)(E), parental rights may be terminated if clear and convincing evidence supports a finding that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E).

Proof of endangerment is required under both subsections (D) and (E). *Id.* §§ 161.001(b)(1)(D), (E). "Endanger" means to expose to loss or injury or to jeopardize a child's emotional or physical health, but it is not necessary that the

---

[5] *See In re C.V.L.*, 591 S.W.3d 734, 750 (Tex. App.—Dallas 2019, pet. denied) (consolidating examination under sections 161.001(b)(1)(D) and 161.001(b)(1)(E) because evidence on these two grounds is interrelated).

conduct be directed at the child or that the child actually suffer an injury. *In re M.C.*, 917 S.W.3d 268, 269 (Tex. 1996) (citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)); *In re J.D.B.*, 435 S.W.3d 452, 463 (Tex. App.—Dallas 2014, no pet.) (citation omitted).

At least three distinctions exist between subsections (D) and (E). First, the primary distinction between the two subsections is the source of the physical or emotional endangerment to the child. *Id.* Subsection (D) addresses the child's surroundings and environment, while subsection (E) addresses parental misconduct. *Id.*; *In re S.K.*, 198 S.W.3d 899, 902 (Tex. App.—Dallas 2006, pet. denied) (subsection (E) "refers only to the parent's conduct, as evidenced not only by the parent's acts, but also by the parent's omissions or failures to act"). However, parental conduct is also relevant to the child's environment under subsection (D). *In re J.D.B.*, 435 S.W.3d at 463. That is, "[c]onduct of a parent or another person in the home can create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection (D)." *Id.* at 464 (quoting *Castaneda v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 509, 522 (Tex. App.—El Paso 2004, pet. denied)). "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home is part of the 'conditions or surroundings' of the child's home under subsection (D)." *Id.* (citing *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) ("A child is endangered when the environment creates a potential for danger that the parent is aware of but

–17–

disregards.")); *see also In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ) ("environment" refers not only to the acceptability of the living conditions but also to a parent's conduct in the home).

Second, termination of parental rights under subsection (D) can be based on only a single act or omission. *See In re L.D.C.*, 622 S.W.3d 63, 71 (Tex. App.—El Paso 2020, no pet.) (citing *In re R.D.*, 955 S.W.2d 364, 367 (Tex. App.—San Antonio 1997, pet. denied)); *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.— Houston [1st Dist.] 2010, pet. denied) (citation omitted); *In re T.B.*, No. 07-12-00538-CV, 2013 WL 2467344, at *5 (Tex. App.—Amarillo May 31, 2013, no pet.) (mem. op.) (citation omitted). However, under subsection (E), termination "must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required." *In re K.S.*, No. 05-15-01294-CV, 2016 WL 1613126, at *14 (Tex. App.—Dallas Apr. 21, 2016, pet. denied) (mem. op.) (internal quotations and citations omitted).

Third, knowledge of paternity is a prerequisite to a showing of a knowing placement of a child in an endangering environment under subsection (D) but not to a showing of a parental course of conduct endangering a child under subsection (E). *A.S. v. Texas Dep't of Fam. & Protective Servs.*, 394 S.W.3d 703, 713 (Tex. App.— El Paso 2012, no pet.) (citing *In re Stevenson*, 27 S.W.3d 195, 201–03 (Tex. App.— San Antonio 2000, pet. denied)); *see In re D.W.*, No. 10-09-00188-CV, 2009

5155890, at *3 (Tex. App.—Waco 2009, no pet.) (mem. op.) (citation omitted); *In re M.J.M.L.*, 31 S.W.3d 347, 351 (Tex. App.—San Antonio 2000, pet. denied).[6]

Subsections (D) and (E) also have additional similarities. Under both subsections, a trial court may consider endangering conduct that occurred before and after the child's birth. *See In re E.N.C.*, 384 S.W.3d 796, 804–05 (Tex. 2012) (agreeing "an offense occurring before a person's children are born can be a relevant factor in establishing an endangering course of conduct") (citation omitted); *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (noting "endangering conduct may include the parent's actions before the child's birth, while the parent had custody of older children, including evidence of drug usage" which was at issue in that case) (citing *In re M.N.G.*, 147 S.W.3d 521, 536 (Tex. App.—Fort Worth 2004, pet. denied)).[7]

Also, under both subsections, a trial court may consider conduct that occurred both inside and outside the child's presence. *Director of Dallas Cty. Child Protective Servs. v. Bowling*, 833 S.W.2d 730, 733 (Tex. App.—Dallas 1992, no writ) (concluding that endangerment under predecessor statute to section 161.001(b)(1)(E) does not require that the child witness the conduct).

---

[6] In this case, Father has raised no issue about paternity or the timing of any evidence under subsection (D). The final order included a finding regarding paternity and stated Father admitted by pleading or in open court that he is R.B.'s biological father and that there is no reason to question the admission—a finding that the trial court had made in several other orders dating back to at least as early as March 25, 2019.

[7] In citing *M.N.G.*, the supreme court included a parenthetical describing *M.N.G.*'s holding as one allowing "courts [to] look to parental conduct both before and after [a] child's birth to determine whether termination is appropriate." *In re J.O.A.*, 283 S.W.3d at 345.

Less clear, however, is whether a trial court may consider conduct that occurred after a child's removal by the Department, or, if it can be, whether a distinction on this issue exists between subsections (D) and (E). Previously, without drawing any distinction between the subsections—and without any analysis, we stated, "The relevant time frame within which to determine whether there is clear and convincing evidence of endangerment to the child is before the child was removed." *In re J.K.F.*, 345 S.W.3d 706, 711–12 (Tex. App.—Dallas 2011, no pet.) (citing *In re C.E.K.*, 214 S.W.3d 492, 496 (Tex. App.—Dallas 2006, no pet.)); *In re C.L.C.*, 119 S.W.3d 382, 392 (Tex. App.—Tyler 2003, no pet.); *Ybarra v. Texas Dep't of Human Servs.*, 869 S.W.2d 574, 577 (Tex. App.—Corpus Christi–Edinburg 1993, no writ)). Like *J.K.F.*, none of the cases we cited for that proposition include any explanation or analysis, and *Ybarra*, the original source of that view, includes no explanation, analysis, or other citation.

In recent years, however, this view has been criticized and rejected, particularly in connection with an analysis of endangerment subsection (E). *See In re R.B.*, Nos. 07-1700187-CV, 07-17-00188-CV, 2017 WL 4785328, at *2 (Tex. App.—Amarillo Oct. 19, 2017, pet. denied) (mem. op.) (criticizing our statement in *J.K.F.* and the *Ybarra* opinion we and other courts relied on). And, even when not directly criticized, many of our sister courts have not applied it, at least with respect to an endangerment analysis under subsection (E). *See In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston (14th Dist. 2014, pet. denied) (stating courts consider the

"child's environment before the Department obtained custody of the child" under subsection (D) but "may consider conduct both before and after the Department removed the child from the home" under subsection (E)) (citations omitted).[8]

Despite the generality of our statement in *J.K.F.*, our own review in that case was consistent with the approach described by our sister court in *S.R.*—that is, while we did not explain that we could consider evidence after a child's removal for subsection (E) purposes, we did, in fact, do so. *See J.K.F.*, 345 S.W.3d at 712–15 (finding sufficient evidence of endangerment under subsection (E) based in part on events occurring after March 2008, when child was removed from mother, and not reaching issue under subsection (D)). We do so again here, at least with respect to subsection (E), and none of the parties have argued we may not do so.

As to endangerment generally, it is not necessary that the conduct be directed at the child or that the child actually suffers injury. *Boyd*, 727 S.W.2d at 533; *In re*

---

[8] *See also In re A.A.M.*, 464 S.W.3d 421, 427 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (in section 161.001(b)(1)(E) analysis, stating trial court reasonably could have concluded that father's continued pattern of drug use, even after Department's involvement, displayed a voluntary, deliberate, continued, and conscious course of endangering conduct); *In re C.J.S.*, 383 S.W.3d 682, 688–89 (Tex. App.—Houston [14th Dist.] 2012, no pet.) ("In considering whether a relevant course of conduct has been established, a court properly may consider evidence establishing that a parent continued to engage in endangering conduct after the child's removal by the Department or after the child no longer was in the parent's care, thus showing the parent continued to engage in the course of conduct in question.") (citation omitted); *In re C.A.B.*, 289 S.W.3d 874, 883 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (in section 161.001(b)(1)(E) analysis, stating "court may consider evidence establishing that a parent continued to engage in endangering conduct after the child's removal by the Department or after the child no longer was in the parent's care, thus showing the parent continued to engage in the course of conduct in question") (citations omitted); *In re S.T.*, 263 S.W.3d 394, 402 (Tex. App.—Waco 2008, pet. denied) (in section 161.001(b)(1)(E) analysis, stating parent's conduct after child's removal was "an additional factor supporting the decision to terminate because it constitutes evidence [he] continued to engage in conduct even though his parental rights were in jeopardy"); *Walker*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (in section 161.001(b)(1)(E) analysis, stating "the conduct may occur . . . both before and after the child has been removed by the Department").

*J.D.B.*, 435 S.W.3d at 463. Specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Boyd*, 727 S.W.2d at 533; *see In re C.V.L.*, 591 S.W.3d at 750 (citing *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (en banc)). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re C.V.L.*, 591 S.W.3d at 750 (citing *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied)).

### 2.    Discussion

As indicated, in Father's first and second issues, and in Mother's second issue, each parent argues the evidence is legally and factually insufficient to support the trial court's findings that each knowingly placed or knowingly allowed R.B. to remain in conditions or surroundings that endanger his physical or emotional well-being and engaged in conduct or knowingly placed R.B. with persons who engaged in conduct that endangers his physical or emotional well-being,

Both parents argue there was no evidence they placed R.B. in or exposed R.B. to an environment that endangered his physical or emotional health. Mother refers to testimony that R.B. was not upset and presented without injury when witnesses observed him. Father argues he did not endanger R.B. and also refers to evidence regarding Mother, stating that law enforcement and Department witnesses testified that they did not see her injuries—though he acknowledges others did—and argues

–22–

Mother was appropriately cared for, was treated with medication and regular psychiatrist visits, and was doing well at the time of trial.

As to any legal authority for their positions, Father and Mother cite various cases for the applicable standards, but they do little to apply any cited cases to the facts as to endangerment. Father does not apply any case to the facts before us on that issue, and although Mother attempts to apply one, her attempt is unavailing. Specifically, she cites *In re E.C.*, No. 02-20-00022-CV, 2020 WL 2071755, at *7 (Tex. App.—Fort Worth Apr. 30, 2020, no pet.) (mem. op.), but she has misunderstood the holding.[9] *In re E.C.* does not support Mother's position.

The Department cites *In re S.R.*, 452 S.W.3d at 360, 362–63 to support its position that the evidence is legally and factually sufficient under subsections (D) and (E). We agree that case supports the Department's argument. *See id*. at 365 (holding evidence, which included evidence of family violence, was legally and factually sufficient to support findings under subsections (D) and (E)).

In this case, a reasonable fact-finder could conclude Father engaged in family violence towards Mother on multiple occasions and that Mother allowed R.B. to remain in that environment. The evidence included testimony from witnesses who

---

[9] According to Mother, *In re E.C.* involved a mother whose admission of a lifetime of drug use was not enough to rise to the level of clear and convincing evidence needed. Because the parents made no similar admissions here, Mother argues the evidence in this case is not enough to rise to the requisite level of proof. Mother has misunderstood the holding in that case, as our sister court concluded the evidence was factually *sufficient* to support a finding under section 161.001(b)(1)(E) in that case. *See In re E.C.*, 2020 WL 2071755, at *7 ("We hold that the evidence, viewed in the appropriate deferential light, was factually sufficient to reasonably form a firm conviction or belief to support the finding" under section 161.001(b)(1)(E)).

–23–

saw marks and bruises on Mother's back and buttocks when bathing her during a May 2018 hospitalization and testimony from Mother's former foster mother, who noticed bruises on Mother around the same time that Mother moved into an apartment with Father during her freshman year of college. The evidence also included testimony from various witnesses about Mother's statements about Father's conduct towards her and R.B., such as statements that he spanked R.B. hard at times, often got very angry and fought, hit her in the head, punched her in the face, pushed her, locked her in the closet for hours, grabbed her arms, wrapped his hands around her body and squeezed, prevented her from leaving, rationed her food, took away her things, including her Bible, and prohibited her from driving, leaving the house, or using her phone. The evidence also included testimony from various witnesses about Mother's own conduct, including appearing to be catatonic inside and outside her home, expressing fear of Father and fear of separation from a female police officer, asking that she be listed as a "no name" patient at a hospital so that Father could not find her, and hiding inside a closet with R.B. for hours, requiring a SWAT team and hostage negotiator to be called to get her to come out of the closet with R.B.

A reasonable fact-finder could also conclude that Father allowed R.B. to remain alone in Mother's care despite Father's concerns to the police regarding Mother caring for R.B. alone because of her mental health issues. The court heard evidence that on February 1, 2019, shortly before R.B.'s removal in this case, police

responded to a call regarding an assault at Father's and Mother's home. Father was ultimately arrested, and after he was placed in custody, Father made it clear to the police he did not believe Mother should be left alone with R.B. due to her mental health issues and that he did not believe R.B. would be safe alone in Mother's care. Father arranged for Mother and R.B. to stay with neighbors instead, and the neighbors agreed. Mother and R.B. went to the neighbors' home. After everyone went to bed, Father called one of the neighbors from jail and spoke with Mother. He told Mother it was okay for her to return to the house by herself with R.B. When the neighbors awoke the next morning, their front door was left partially open and unlocked, and Mother and R.B. were not there.

All of the evidence in the prior two paragraphs involved events occurring on or before R.B.'s removal. The trial court heard other, similar evidence about events occurring after R.B.'s removal. For example, the trial court heard testimony about Mother's emergency room visit on February 13, 2020 and admission to a crisis stabilization unit for about a month thereafter. The emergency room nurse who interacted with Mother during that emergency room visit observed Mother to be stressed, extremely fearful, and very anxious, and she observed that Father talked for Mother, did not allow her to speak, and did not allow Mother to be left alone, even to provide a urine sample. Because of her concerns, the nurse separated them, and when she did, Mother became so upset she urinated on herself. Mother later expressed fear that Father would go to prison and that she would become homeless,

–25–

and she described Father as the person that gave her money and food after they had sex. Mother also told the nurse about a closet she would go into to hide when she was afraid. The nurse contacted police, who responded, and the officer who spoke with Mother observed Mother to be very frightened and confused and heard Mother refer to Father by three different names as if she was referring to three different people. Mother was involuntarily admitted into a crisis stabilization unit the following day, and at the time of admission, Mother was near catatonic, a state she remained in for more than a week. Mother remained at the facility for about a month before being discharged. At discharge, her diagnosis was major depressive disorder, recurrence severe with psychosis and partial remission, and post-traumatic stress disorder.

Additionally, the trial court heard evidence regarding events on August 25, 2020, when Mother ran to her neighbors' house in a manner that the neighbor described as "running for dear life." The neighbor testified that Mother's face was covered with bruises, with both eyes blackened, and Mother had bruises on her head, bruises up and down her arms, and swollen lips. The neighbor testified Mother was very scared and very frightened that Father would find her. While they waited for police to arrive, Mother told the neighbor Father had "done this to her," "sat on her," "beat her," and "strangled her." When the neighbor offered Mother a seat, Mother told the neighbor she could not sit down because Father "had beaten her with a belt and belt buckle."

At trial, Mother denied any abuse occurred. She did so while testifying by video from Father's home, with Father in the same room, and while Mother and Father appeared together on-screen. Mother testified she and Father were no longer living together and that she was living with a family friend, but she also admitted that in the week before trial, she and Father attended a visit with R.B. together, portrayed themselves as a couple, and held hands throughout the visit.

After reviewing all the evidence in the light most favorable to the termination findings, we conclude a reasonable factfinder could have formed a firm belief or conviction as to the truth of the findings that Father and Mother knowingly placed or knowingly allowed R.B. to remain in conditions or surroundings which endanger his physical or emotional well-being under subsection (D) and engaged in conduct or knowingly placed R.B. with persons who engaged in conduct which endangers his physical or emotional well-being under subsection (E). We also conclude, based on the entire record, that the disputed evidence that a reasonable factfinder could not have credited in favor of these termination findings is not so significant that a factfinder could not reasonably have formed a firm belief or conviction as to the truth of these findings under both subsection (D) and (E).

We therefore hold the evidence is legally and factually sufficient to support the predicate termination findings under subsections (D) and (E). *See* TEX. FAM. CODE §§ 161.001(b)(1)(D), (E); *In re L.E.S.*, 471 S.W.3d 915, 923–26 (Tex. App.—Texarkana 2015, no pet.); *In re S.R.*, 452 S.W.3d at 365.

We overrule Father's first and second issues and Mother's second issue. As a result, we need not reach parents' issues regarding section 161.001(b)(1)(O)[10] because only one predicate finding is necessary to support a judgment of termination of parental rights when there is also a finding that termination is in the child's best interest. *See In re A.V.*, 113 S.W.3d at 362.

## B. R.B.'s Best Interest Under Section 161.001(b)(2)

In Father's fourth issue and Mother's third issue, each parent challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of their parent-child relationships with R.B. is in R.B.'s best interest. *See* TEX. FAM. CODE § 161.001(b)(2).

### 1. Applicable Law Under Section 161.001(b)(2)

"Best interest" is a term of art encompassing a broad "facts-and-circumstances based evaluation that is accorded significant discretion." *In re Lee*, 411 S.W.3d 445, 460 & n.22 (Tex. 2013). The best interest prong "is child-centered and focuses on the child's well-being, safety, and development," *In re A.C.*, 560 S.W.3d at 631, and it allows a court to consider the following non-exclusive factors:

(1) the desires of the child;

(2) the emotional and physical needs of the child now and in the future;

(3) the emotional and physical danger to the child now and in the future;

---

[10] Thus, we do not address Father's third issue and Mother's first issue, in which each parent argues the evidence was legally and factually insufficient to support the trial court's findings under section 161.001(b)(1)(O).

–28–

(4) the parental abilities of the individuals seeking custody;

(5) the programs available to assist these individuals to promote the best interest of the child;

(6) the plans for the child by these individuals or by the agency seeking custody;

(7) the stability of the home or proposed placement;

(8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(9) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see In re A.C.*, 560 S.W.3d at 631 & n.29 (citing *Holley*, while listing many of these same factors and noting that family code section 263.307 also provides additional best-interest factors).[11]

These *Holley* factors are not exhaustive, and a best-interest finding need not be supported by evidence of every *Holley* factor. *In re C.H.*, 89 S.W.3d at 27. The same evidence can be relevant to both section 161.001(b)(1) termination grounds

---

[11] Section 263.307(b) lists several best-interest factors that the trial court and the Department can consider in determining whether a child's parents are willing and able to provide the child with a safe environment, including (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department or other agency; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, or other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b). Father and Mother list the *Holley* factors and do not discuss these other factors in their briefs.

–29–

and the child's best interest.  *Id*.  Moreover, while there is a strong presumption that maintaining the parent–child relationship serves the child's best interest, there is also a presumption that promptly and permanently placing the child in a safe environment is in the child's best interest.  TEX. FAM. CODE §§ 153.131(b); 263.307(a); *In re D.W.*, 445 S.W.3d 913, 925 (Tex. App.—Dallas 2014, pet. denied).

In *C.H.*, the supreme court stated, "The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child."  *In re C.H.*, 89 S.W.3d at 27.  Although "paltry evidence relevant to each [*Holley* factor] would not suffice to uphold [a factfinder's] finding that termination is required," *id*., the evidence here is sufficient.

## 2. Discussion

Both parents argue the evidence to support the trial court's best interest finding under section 161.001(b)(2) is legally and factually insufficient under the *Holley* factors; however, only Father attempts to apply the *Holley* factors to the evidence here, and his attempt is limited to the first three factors.  As Father notes, on the first *Holley* factor, R.B. was less than three years old at the time of trial, and no evidence regarding his desires was presented.  Father cites no evidence as to the second and third *Holley* factors and simply argues the evidence on them is

insufficient.  Mother makes no attempt to apply the *Holley* factors at all to the record evidence, though she does list what the factors are.

Rather than focusing their arguments by applying the *Holley* factors to the record evidence, Mother and Father instead make the same general argument that certain best interest testimony was conclusory and insufficient as a result.  In doing so, both parents cite the testimony provided by Ramon Hodridge, one of the Department's conservatorship workers involved in this case.  Hodridge worked on this case from February 2020 to November 2020.  Hodridge expressed support of the Department's position that termination of parental rights was in R.B.'s best interest and did not believe either parent was able to provide R.B. with a safe and stable home.  On cross-examination by Father's counsel, Hodridge testified:

> [FATHER'S COUNSEL]: In your recommendation today, you recommended that termination is in the best interest of the child.  Is that correct?
>
> [HODRIDGE]:  That is correct.
>
> [FATHER'S COUNSEL]:  Upon what do you base that decision?
>
> [HODRIDGE]:  Solely based off since I'm believing that [Mother] and [Father] have gotten back together and that since [Mother] has not finished services at this time, due to them being on the family service plan together, that is normally the Department's stand is that if they are united as one, then both need to complete. Otherwise, we may still be placing the child back in an unsafe situation. And then I was also made aware of the allegations of that other things have come to light in reference to the abuse.  If any of those allegations are true, then I would have to stand by not allowing [R.B.] to return home.

In criticizing this testimony, both parents selectively quote only a portion of this answer, focusing only on the witness's reference to the Department's normal stance on family service plans. The parties ignore the remainder of the answer.

Father and Mother also ignore the testimony about R.B.'s best interest provided by CASA, R.B.'s guardian ad litem. Debra Panos, the volunteer who testified on behalf of CASA, testified that it is in R.B.'s best interest to have Father's and Mother's parental rights terminated because "the ongoing mental health issues with [Mother] and the issues of domestic violence – potential domestic violence with [Father] would prevent us from recommending reunification." Panos indicated that to determine R.B.'s best interest, she attended monitored visits, visited with R.B. twice a month at his placement for the two years before trial, reviewed medical and court records, attended hearings, and was in contact with CPS. She also took various things into account, including the parents' medical history, the services undertaken and the programs utilized by the parents during the period of time the case had been open, R.B.'s emotional and physical needs during that period of time, any emotional or physical danger R.B. had suffered or might suffer in the future, the parents' parenting abilities and what

they could provide if reunification with R.B. occurred, the stability of the parents' home, and the information shared in trial.

Finally, the parents ignore other evidence, including the evidence summarized above regarding the long history of family violence between Father and Mother—a history that, according to the record before us, began before R.B. was born and continued well after, including both before and after R.B.'s removal and even after Father completed BIPP.

The Department argues that the trial court's best interest finding is supported by legally and factually suffiient evidence, particularly with regard to the third and seventh *Holley* factors and the fourth, sixth, seventh, and eleventh factors listed under section 263.307(b). *See Holley*, 544 S.W.2d at 371–72; TEX. FAM. CODE § 263.307(b). We agree with the Department.

Based on the record evidence, when viewed in the light most favorable to the ruling and as a whole, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that termination of Father's and Mother's parental rights is in R.B.'s best interest and therefore hold the evidence is both legally and factually sufficient to support the trial court's best interest findings as to both parents under section 161.001(b)(2). *See Holley*, 544 S.W.2d at 371–72; TEX. FAM. CODE §§ 161.001(b)(2), 263.307(b).

We overrule Father's fourth issue and Mother's third issue.

## C. Conservatorship

In her fourth issue, Mother argues the trial court erred by appointing the Department, a non-parent, as R.B.'s conservator because, in her view, the evidence did not support a finding that appointing her as R.B.'s conservator would significantly impair R.B.'s physical health or emotional development. Mother cites family code section 153.131(a) and *Lewelling v. Lewelling*, 796 S.W.2d 164, 166 (Tex. 1990) to support her position. Section 153.131 states:

> (a) Subject to the prohibition in Section 153.004, unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child.

> (b) It is a rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child. A finding of a history of family violence involving the parents of a child removes the presumption under this subsection.

*See* TEX. FAM. CODE § 153.131. *Lewelling* discussed similar evidentiary standards under a now-repealed statute, but in a divorce context, and not in a situation where the conservatorship determination at issue resulted from the termination of parental rights. *See Lewelling*, 796 S.W.2d at 165, 167 (concluding court of appeals erred in affirming trial court's award of permanent custody to paternal grandparents in divorce proceeding when no evidence showed mother's appointment would significantly impair child's physical health or emotional development).

The Department argues that Mother lacks standing on this issue and cites as support *In re C.J.B.*, No. 05-19-00165-CV, 2019 WL 3940987, at *9–10 (Tex. App.—Dallas Aug. 21, 2019, no pet.) (mem. op.) and *In re J.D.G.*, 570 S.W.3d 839, 856 (Tex. App.—Houston [1st Dist.] 2018, pet. denied).

We agree with the Department. As we stated in *In re C.J.B.*:

> When the parents' rights are terminated, the trial court must appoint 'a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child.' 'The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child.' Conservatorship determinations are reviewed for an abuse of discretion and will be reversed only if the decision is arbitrary and unreasonable.

> An order terminating the parent-child relationship divests the parent of all legal rights and duties with respect to the child. Because we have decided against [appellant] regarding her challenge to the portion of the trial court's order terminating her parental rights, that order has divested [appellant] of her legal rights and duties respecting [the child]. As a result, [appellant] does not have standing to challenge the portion of the order appointing the Department as sole managing conservator of [the child] because any alleged error could not injuriously affect her rights.

*In re C.J.B.*, 2019 WL 3940987, at *9–10 (citations omitted); *see In re E.M.*, No. 05-18-01161-CV, No. 05-18-01162-CV, No. 05-18-01163-CV, No. 05-18-01164-CV, No. 05-18-01165-CV, No. 05-18-01166-CV, No. 05-18-01167-CV, 2019 WL 1449791, at *9 (Tex. App.—Dallas Apr. 1, 2019, no pet.) (mem. op.) (same) (citation omitted).

As we did in *In re C.J.B.* and *In re E.M.*, in light of our rulings on Mother's other issues and our decision to affirm the termination of her parent-child

relationship with R.B., we conclude Mother lacks standing to challenge the appointment of the Department as R.B.'s permanent non-parent managing conservator. *See In re C.J.B.*, 2019 WL 3940987, at *9–10; *In re E.M.*. 2019 WL 1449791, at *9. We overrule Mother's fourth issue.

## V. CONCLUSION

For the reasons explained above, we affirm the trial court's judgment.

/Ken Molberg/

210043f.p05

KEN MOLBERG
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF R.B.,
A CHILD

No. 05-21-00043-CV

On Appeal from the 199th Judicial
District Court, Collin County, Texas
Trial Court Cause No. 199-30016-
2019.
Opinion delivered by Justice
Molberg. Justices Reichek and
Nowell participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 9th day of July, 2021.